In re **BRICKLAYERS' LOCAL NO. 1
OF PA. WELFARE FUND.**
Civ. A. No. 23863.

United States District Court
E. D. Pennsylvania.

Feb. 18, 1958.

Louis H. Wilderman, E. H. Cushman, Herman J. Obert, Philadelphia, Pa., for petitioners.

CLARY, District Judge.

This matter involves a proceeding under an agreement and declaration of trust for employee benefits between the Employing Bricklayers' Association of Philadelphia as the bargaining representative of those firms and individuals employing bricklayers in the City and County of Philadelphia, and the Bricklayers, Masons and Plasterers International Union of America, Bricklayers' Union Local No. 1 of Pennsylvania, dated August 1, 1949, and amended as of May 1, 1951 and August 5, 1952, and further amended as of October 1, 1955.

The agreement here involved was part of a collective bargaining agreement between the two parties in respect to wages, hours and working conditions referable to bricklaying work performed within the municipal limits of the City of Philadelphia and such other territory adjacent thereto, as might be determined and approved from time to time by the International Union to be within and under the jurisdiction of Union Local No. 1. The agreement in usual form was drawn to bring the operation of the trust within the exceptions provided by the Labor-Management Relations Act of June 23, 1947, c. 120, Title 3, § 302(c), 61 Stat. 157, 29 U.S.C.A. § 186(c). It provided that the Association and Union Local No.

1 should each designate two trustees to take charge of the trust estate for the purpose of paying benefits to union members and their dependents from the welfare fund set up by the terms of the instrument. Other provisions in the agreement provided for procedures to be followed by the trustees and the welfare officer (the executive director appointed by the trustees), the detailing of which is not necessary for a decision in the case. The paragraph of the agreement with which we are most concerned in the present proceeding is the Fifth: (a) 6, which reads as follows:

"To invest, reinvest and keep invested so much of the Trust Estate as the trustees in their discretion deem necessary or desirable: Provided, however (1) that the trustees shall be limited to such investments as are permitted by law to trustees under the laws of the State of Pennsylvania: (2) that the income received from such investments, and any dividends, interest or income received on or from the money or property received by the trustee pursuant to paragraph Sixth hereof shall be added to the Trust Estate from which payment of premiums shall be made."

It will be noted that under subsection (1) above quoted, the investment of the corpus of the trust shall be limited to those permitted by law to trustees under the laws of the State of Pennsylvania. The Fiduciaries Investment Act of 1949 of the Commonwealth of Pennsylvania, The Act of May 26, 1949, P.L.1828, Sec. 10, P.S. Title 20, Sec. 821.10 Real Estate, provides as follows:

"Real estate located in Pennsylvania, other than ground rents, shall be an authorized investment if the court, upon petition, aided if necessary by the report of a master, and being of the opinion that the investment will be for the advantage of the estate and that no change will be made in the course of succession by the investment, shall direct such investment."

Pursuant to the mandate of the Fiduciaries Investment Act, the trustees, through their counsel, under conditions which will be hereinafter more fully related, filed their petition in the Court of Common Pleas No. 1 of Philadelphia County as of September 3, 1957, No. 2626, asking the court for an order authorizing an investment in real estate located in the City and County of Philadelphia. Counsel for several members of the union, the beneficiaries of the trust fund, appeared in opposition thereto, challenging both the propriety of the expenditure in question as well as the jurisdiction of a State court to hear and determine the matter. The jurisdictional question posed to the court was whether the provisions of Section 302 of the Act of June 23, 1947, supra, vested exclusive jurisdiction over the subject matter here involved in the Federal district courts. It was the contention of the trustees, since the matter involved a judicial determination under the laws of Pennsylvania, even assuming proper jurisdiction in a Federal court, that, nevertheless, the State court had concurrent jurisdiction. This contention was strongly resisted by counsel for the objecting members of the union, who strenuously urged upon the court the exclusive jurisdiction of the Federal court. After a hearing limited primarily to the question of jurisdiction, President Judge Peter F. Hagan of the Court of Common Pleas No. 1 of Philadelphia County filed his opinion on December 27, 1957, holding that Section 302 vested in Federal tribunals exclusive jurisdiction over the subject matter presented by the petition and accordingly dismissed the petition for lack of jurisdiction. The merits of the petition were neither considered nor discussed. Thereafter, on January 3, 1958, the present proceeding was instituted in this court under the provisions of Section 302(c) of the Labor-Management Relations Act of 1947 and Section 10 of the Fiduciaries Investment Act of 1949 of the Commonwealth of Pennsylvania. Upon petition of the trustees, notice of the petition and of a hearing to be held thereon on Janu-

ary 28, 1958 was mailed to each union member so that any interested party or person would have the opportunity to appear and be heard by the court if desired. The hearing was held as scheduled, testimony taken, and the hearing concluded. The testimony developed the following facts:

As provided in the welfare agreement the trustees in their joint capacity known as "Bricklayers' Local No. 1 of Pa. Welfare Fund" established the principal office of the fund at 4847 North Broad Street in the City and County of Philadelphia. The agreement further provided that the trustees should have the power to designate wherever else they wished the principal office to be located. The quarters comprise an area about 360 square feet for which a rental of $660 per year is paid. The business affairs of the fund are conducted under the supervision of the welfare officer, assisted by two regular full-time employees, with additional help by part-time employees as from time to time found necessary. The current beneficiaries, including members and dependents, total some 4,461 persons of which 1,437 are members and 3,024 are dependent beneficiaries. Benefits are paid by the Travelers Insurance Company under a policy purchased by the trustees. The welfare officer and his assistants are charged with the responsibility of processing claims under the terms of the welfare agreement and the aforesaid policy; the presentation of the claim to the company and the follow-up procedures to make sure the claims are paid to the beneficiaries. Benefits are paid under the welfare fund provision of approximately $160,000 per year. Because of the limited space and the accumulation of records and equipment, the trustees reached the conclusion that the present quarters were inadequate. Some time in the Fall of 1957, after consulting with Richard B. Herman, their real estate agent, and their certified public accountant S. William Lapan, consideration was given to the amount of space necessary for reasonable operation of the fund. It was determined that 1,600 square feet of space would be needed immediately to conduct suitable operations. Investigation of locations wherein these operations might be conducted in rented quarters established the fact that it would be necessary to pay $4 annual rental per square foot for appropriate quarters. Consideration was then given to the purchase of a property as opposed to renting someone else's property. It was found that a granite, 3-story house, recently remodeled for offices to house a contracting and engineering firm, located on the southwest corner of Hunting Park Avenue and Old York Road, in the City of Philadelphia, (a few blocks from their present location) was available for purchase. The property with a frontage of approximately 50 feet, approximately 120 feet on each side, and approximately 70 feet in the rear, contains 7,129 square feet. The building, containing over 10,000 square feet, has a newly installed oil-fired hot water heating system and a complete new electrical system. The purchase price was set at $45,000. Appraisals by Richard J. Seltzer, realtor, and J. Solis Cohen, Jr., a member of the American Institute of Real Estate Appraisers, both of whom are known to the court to be expert and qualified appraisers, fixed the value respectively at $52,000 and $50,000. The welfare officer, acting under the direction of the trustees, then made up a schedule (P–3) of the estimated expenses of the new building. Because of the excellent location it was felt that at least during the first few years, when the use of the whole building was not required for the operation of the fund, two of the floors could be rented to produce an income of between $3,600 and $4,800. For estimating purposes a figure of $4,200 was used. Allowing for a loss of interest on the investment of $50,000 at 3%, or $1,500, the annual net saving in the operation of the building was estimated to be $1,626.54. A further estimate was made that assuming a rental charge of $5,700 per year would have to be paid for adequate space the cost of the building and repairs would be amortized in less than ten years. The net worth of

the fund as of October 31, 1957 was $393,000. With average monthly premium charges and expenses of the fund set at approximately $15,000 per month, even after the purchase of the building and assuming absolutely no receipt of any revenue of any nature (the current yearly revenue receipt level is approximately $240,000), the fund could operate for a period of approximately two years. Acting on the above information and the calculation of projected savings in purchasing rather than renting property, the trustees entered into an agreement to purchase the said building for $45,000. This agreement entered into as trustees of course would, under the Fiduciaries Investment Act of 1949 of the Commonwealth of Pennsylvania, require court approval, which is sought in this proceeding.

The Union designated trustees John J. Hennelly and John M. Doyle, and the employer designated trustees John G. Bowman, Jr. and R. Walton Struse, Jr. petitioned the court for approval of the purchase. At the hearing held on Tuesday, January 28, 1958, the testimony developed that on Monday, January 27, 1958, the day preceding the hearing, John J. Hennelly and John M. Doyle had been replaced as union designated trustees of the fund by Paul A. Paulson and Daniel J. Walsh, and each of the new trustees testified that he was opposed to the investment of the funds in real estate. However, both of the new trustees admitted lack of sufficient information to make an intelligent decision. There also appeared William E. Boyd, president of Local No. 1, Francis A. Craig, recording secretary of Local No. 1, and William Tsoubis, a long-time member of Local No. 1 and a long-time advocate of welfare funds for union members. The objections raised by these two officers and one member were directed against the operation of the fund and to the fact that the benefits provided in the agreement were not adequate and that any money in the fund should be used for an increase in benefits rather than for the purchase of any real estate. A former president of Local

No. 1 and a member for approximately thirty-five years, Eugene B. McGough, stated his opposition on two grounds: (1) that in case of a recession the funds might be needed for benefits, and (2) that even if the fund should continue to grow, it might well result in a condition unfavorable to the union welfare itself in that the control of a large sum of money might create dissatisfaction within the union membership. He explained that his objection was directed toward a prospective or possible division of authority within the union itself and that outside influences, or as he expressed it— a dictatorship, might very well have an adverse effect on the principles of trade unionism.

So far as the Court has been able to determine this is a case of first impression. However, the Legislative History of the Taft-Hartley Act is illuminating. In the original House version of the Labor-Management Relations Act of 1947 it was made an unfair labor practice for an employer to make payments of any kind to any labor organization, or to any fund or trust established by such organization in which the labor organization exercised any control directly or indirectly. In explaining the reason for such a provision, House Report No. 245, H.R. 3020, page 29, Leg.Hist. 320, accompanying the bill stated:

"Certainly, it is not in the national interest for union leaders to control these great unregulated, untaxed funds derived from exactions upon employers."

This provision was sharply criticized by the minority report of the House Committee on Education and Labor. The minority report stated that:

"We would have no objection to requiring that trust funds to which an employer makes contributions be jointly controlled by the employer and the union. Under this bill an employer would be forbidden to contribute to any fund over which the union has any control, even though it is jointly administered

with the employer. This result is completely unreasonable. Its full implications can only be appreciated when we realize that health-benefit funds are part of collective bargaining agreements involving more than 15 international unions covering some 600,000 workers. * * *

"This bill would invalidate almost two-thirds of the existing health-benefit agreements. The resulting industrial unrest is a fact that cannot be ignored. * * * Provisions which deny employees and organizations the opportunity to make voluntary provisions against illness and insecurity can only increase reliance upon the state. In the interests of sound governmental policy such dependence upon the state should be checked by encouraging the formulation and adoption, through voluntary agreement, of plans that will aid citizens during the period of misfortune or economic distress." House Minority Report, No. 245, H.R. 3020, page 79, 1 Leg.Hist. 370.

The Senate rejected the views expressed in the House Majority Report and concurred in the House Minority Report. Due to the conflict between the views as expressed in the Hartley Bill from the House and the Taft Bill from the Senate, the two bills were referred to Conference. The Conference Report adopted the provisions of the Senate amendment, accepting the suggestions'of the House Minority Report, the result being set forth in the present provisions of Section 302.

In the single appellate case which the Court had brought to its attention, Copra v. Suro, 1 Cir., 1956, 236 F.2d 107, Chief Judge Magruder held that Congress intended by Section 302(e) to create a broad equity jurisdiction that would not only authorize the district courts to forbid the making of payments from welfare funds in violation of Section 302(a) and (d), but that would also authorize them to exercise a more general equity power over the welfare funds

whose life in effect depends upon the permissive exception of Section 302(c)(5).

There are multiple problems involved in a determination of the issues raised by the petition and the objections thereto. They include jurisdiction of the court; whether the proposed expenditure is prohibited by the provisions of Section 302; whether the fact that the presently designated two union trustees oppose the purchase nullifies the act of the former trustees, and, finally, whether the trustees (assuming statutory permission to invest in real estate with court approval) have properly exercised their discretion under the particular circumstances of this case.

 Taking up the problems seriatim, it appears to the Court that the position taken by Judge Hagan in the State Court proceeding is sound. He stated that he would look to the merits of the petition rather than the form of action and would treat the matter as one brought under Section 302(e) wherein the district courts of the United States are given jurisdiction to restrain violations of Section 302. The Court, therefore, despite the fact that this proceeding is before the court on a petition of the trustees to invest in real estate rather than by a petition of union members to restrain the expenditure, will determine the issues involved since in effect the Court will restrain the expenditure should it refuse permission to make the investment. While Section 302 does not set forth who may or may not be parties to an action under Section 302(e), it is clear from the foregoing that the parties to this action are proper parties for a suit under the aforesaid section. Copra v. Suro, supra, 236 F.2d at page 114.

 As to whether the proposed expenditure is prohibited by Section 302(c)(5), it is the contention of the objectors that the investment would violate the provisions of the section that the trust fund must be held for the sole and exclusive benefit of the employees. However, no testimony was adduced and the objectors have failed to point up in what way the

purchase of a building to house the operation of the welfare fund would be other than for the sole and exclusive benefit of the employees. It is clear that the operation of the fund requires adequate space which must either be rented or owned. The exhibits introduced in this case indicate beyond peradventure of doubt the total inadequacy of the present quarters. It was necessary to purchase several pieces of office equipment and the present space is so restricted that only one can be operated at a time. No challenge has been raised by the objectors to the necessity of the rental expense. It would appear, therefore, that the objection made relates rather to the business judgment of the trustees than the fact that the investment would violate the provisions against the use of money other than for the sole and exclusive benefit of the employees. Title will be in the trustees of the fund and it is rather difficult to conceive how the ownership and operation of the building would be other than for the sole and exclusive benefit of the employees.

The next question which should be discussed is whether the present opposition to the purchase by the two newly designated union trustees nullifies the acts of the former trustees. Section 947 of the Fiduciaries Act of 1949, 20 P.S. § 947,[1] provides that a substituted or succeeding trustee shall have all the powers, duties and liabilities of the original trustee, and shall stand in the predecessor's stead for all purposes, except that he shall not be personally liable for the acts of his predecessor. I interpret that provision as binding the succeeding trustees as to all acts of the preceding trustees done in good faith and in the reasonable exercise of their discretion as trustees. The absolute requirement of the language of Section 302 is that there be joint action by representative trustees of employers and employees. In case of disagreement the Section provides a method of resolving the differences through neutral persons or an impartial umpire with an ultimate appeal to the court in the event the disagreement cannot be resolved amicably. The business of any organization, and that includes the operation of welfare funds, can be carried out only if decisions properly reached, after mature consideration, are given effect by the courts. If by unilateral action in removing two of four trustees either employers or a union representing the employees can effectively destroy proper actions taken in good faith by the ousted trustees after responsible and judicious consideration of the proposed undertaking, the administration of all welfare funds will be in danger. I, therefore, hold that the change in union representatives cannot in and of itself nullify the action of the predecessor trustees. If the action was taken in good faith and was proper under the circumstances, it should be approved.

The final problem posed is whether the proposed investment is such as is permitted to trustees under Pennsylvania law and whether the trustees have properly exercised their discretion under the particular circumstances of the case. The only section of the Fiduciaries Investment Act of 1949 which spells out the elements of an investment to be considered by the trustees in the purchase of investments for trust funds is contained in Section 6(1), 20 P.S. § 821.6, which relates to Corporate Bonds. While this section is not applicable to proceedings involving the purchase of real estate, it sets out in some detail the factors to be considered in making investments, and reads as follows:

"Section 6. Corporate bonds * * * shall be an authorized investment if—

"(1) purchased in the exercise of that degree of judgment and care, under the circumstances then prevailing, which men of prudence, discretion and intelligence exercise in the management of their own af-

1. Now 20 P.S. § 320.947.

fairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income to be derived therefrom as well as the probable safety of their capital."

It appears to the Court that these identical factors should be considered by a court in reviewing an application by fiduciaries to purchase real estate. There are no appellate authorities to guide the court in the determination of this issue, except the dictum of Chief Judge Magruder in Copra v. Suro, supra, 236 F.2d at page 115, that Congress intended to give the district court a general equity power over the welfare funds whose life in effect depends upon the permissive exception of Section 302(c)(5).

There are no Federal cases interpreting this aspect of Section 302. By analogy, however, the language of Mr. Justice Douglas in the case of Textile Workers Union of America v. Lincoln Mills, 1957, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972, becomes important. In that case the Supreme Court decided that in an action under Section 301(a) the substantive law to be applied is Federal law which the courts must fashion from the policy of our national labor laws and that Federal interpretation of the Federal law would govern. However, this significant language is added at page 457 of 353 U.S., at page 918 of 77 S.Ct.:

"But state law, if compatible with the purpose of § 301, may be resorted to in order to find the rule that will best effectuate the federal policy. See Board of Commissioners of Jackson County v. United States, supra, 308 U.S. [343], at pages 351–352, 60 S.Ct. [285], at pages 288–289 [84 L.Ed. 313]. Any state law applied, however, will be absorbed as federal law and will not be an independent source of private rights.

"It is not uncommon for federal courts to fashion federal law where federal rights are concerned. See Clearfield Trust Co. v. United States,

318 U.S. 363, 366–367, 63 S.Ct. 573, 574–575, 87 L.Ed. 838; National Metropolitan Bank v. United States, 323 U.S. 454, 65 S.Ct. 354, 89 L.Ed. 383. Congress has indicated by § 301(a) the purpose to follow that course here. There is no constitutional difficulty. Article III, § 2, extends the judicial power to cases 'arising under * * * the Laws of the United States * * *.' The power of Congress to regulate these labor-management controversies under the Commerce Clause is plain. Houston, East & West Texas R. Co. v. United States, 234 U.S. 342, 34 S. Ct. 833, 58 L.Ed. 1341; National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893. A case or controversy arising under § 301(a) is, therefore, one within the purview of judicial power as defined in Article III."

■ Since there are no Federal statutes or decisions covering the particular problem before the Court, we must look to the law of Pennsylvania for guidance. The case of Geron v. Kennedy, 1955, 381 Pa. 97, 112 A.2d 181, Musmanno, J., holds generally that where discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court, except to prevent an abuse by the trustee of his discretion. That case involved the payment of a pension under the Anthracite Health and Welfare Fund of the United Mine Workers of America.

■ Section 821.10 of the Fiduciaries Investment Act of 1949 is based upon Section 41(a)(2) of the Fiduciaries Act of 1917. There appear to be no Pennsylvania appellate cases interpreting this section. I can only conclude, therefore, that Section 10 of the Fiduciaries Investment Act was enacted in order to give a court of competent jurisdiction an opportunity to determine whether a proposed investment in real estate would in fact be an abuse of discretion on the part of

the trustee. The question then presented in this petition would seem to be is the investment of $45,000 of trust funds, which would not only give the interested fund adequate quarters but by projected savings liquidate the investment within ten years, an abuse of discretion on the part of the trustees? In essence my inquiry is as to the sufficiency of the presentation of the reasons which prompted the determination of the trustees to make the purchase and particularly the question of good faith of the trustees in their unanimous determination.

There has been no challenge to the underlying security which the Court finds to be entirely adequate. There has been no valid objection taken to the business judgment of the trustees in arriving at their conclusion. It is my conviction and finding, after considering all of the testimony adduced, that the action of the trustees was in good faith, was calculated to and undoubtedly will promote the expeditious and economical operation of the fund, and that the prayer of the petition should be granted.

An attempt was made on the part of the objectors to expand the scope of this proceeding to include an investigation into the adequacy of benefits under the welfare fund and a challenge to the legal propriety of some of the provisions of the welfare agreement. No answer was filed by the objectors and I do not conceive it to be the duty of the Court to pass upon these questions not raised by proper and formal pleadings. If the objectors feel aggrieved with the sufficiency of the benefits paid under the plan, the trust agreement itself provides certain procedures for resolving these differences. They cannot be made part of the present controversy.

An appropriate order may be submitted by the petitioners in accordance with the foregoing opinion.