A. RAYMOND, Charles Blum, Harold Jacoby, George Bucher, Stephen Mato and John Dulczak, Trustees of Local 837 Pension Fund, a trust fund

v.

Sal B. HOFFMANN, Chairman, and A. J. Becker, Ralph O. Campbell, H. J. Malerstein, Lee Henson, Grant G. Simmons, Jr., R. Alvin Albarino, Martin L. Garber, and Henry W. Conrad, members, constituting the Board of Governors of the U. I. U. National Pension Trust, a trust fund.

Civ. A. No. 37356.

United States District Court
E. D. Pennsylvania.

March 25, 1966.

Edward B. Bergman, Philadelphia, Pa., for plaintiffs and intervenor plaintiffs Joseph English and others.

David Berger, Philadelphia, Pa., for intervenor plaintiffs.

Harold Berger, Irving L. Mazer, Philadelphia, Pa., for Howell Mfg. Co., and others, intervenor plaintiffs.

Ehrenreich, Sidkoff, Edelstein & Shusterman, Philadelphia, Pa., for Display Mfrs., Inc. and Metalstand Corp.

Erwin Lodge, Philadelphia, Pa., for Victory Metal Mfg. Corp.

Edward W. Medeira, Jr., Philadelphia, Pa., for Kroehler Mfg. Co.

M. H. Goldstein, Philadelphia, Pa., for defendants.

MEMORANDUM AND ORDER SUR
DEFENDANT'S MOTION UNDER
RULE 12(b) (DOCUMENT 4)

VAN DUSEN, District Judge.

This case is before the court on the defendants' motion to dismiss the Complaint filed February 1, 1965.

The present suit arises out of an agreement between two labor unions, the Upholsterers International Union (hereafter referred to as the "UIU") and the International Brotherhood of Teamsters (hereafter referred to as the "Teamsters").

Due to a schism in the hierarchy of the UIU, a dissident group of union officials, headed by George Bucher, arranged (after oral agreement with Sal B. Hoffmann, President of the UIU, and John B. Backus, President of the Teamsters Joint Council 53 in Philadelphia) to dissociate themselves and the employees they represented from the UIU and to affiliate with the Teamsters.[1]

The salient points of the oral agreement were (1) that a new Teamsters Local (No. 837) would be created to represent a part of the membership of UIU Local No. 37, (2) that a portion of the collective bargaining agreements previously in effect between the UIU through its Local 37 would be assigned to the new Teamster Local 837, (3) that assets of UIU Local 37 would be ratably distributed between the new union and the remainder of the old one, (4) that neither union would engage in the practice known as "raiding," (5) that any change in the status of the employees contemplated by the above arrangement would be voted on by the employees themselves, and (6) that George Bucher and the other dissidents would resign from the UIU and become charter members of the new Teamsters Local 837. These points were orally agreed to in September of 1964 and confirmed in writing in November 1964.

On October 19, 1964, a form letter was sent to all the employees in the group proposed for transfer.[2] The form letter contained a ballot and directions to vote for either (1) remaining in the UIU or (2) joining the Teamsters. The result of the balloting was that an overwhelming number of employees in each of 36 plants (the operators of which formerly bargained with UIU) voted to leave the UIU and join the Teamsters. This letter contained the following language, inter alia:

"To The U.I.U. Members in

U.I.U. Local No. 37 Employed

By ————————————————

"Greetings:

" * * *

"We have decided to ascertain from you whether or not you would have any objection to being transferred to the Teamsters' Union.

"Accordingly, and by order and authorization of the Upholsterers' International Union General Executive Board, you are herewith requested to indicate on the enclosed ballot whether or not you are willing to be transferred from the Upholsterers' International Union to a Local Union to be chartered by the Teamsters' Union.

" * * *

Fraternally yours,
/s/ Sal B. Hoffmann
Sal B. Hoffmann

INTERNATIONAL PRESIDENT"

No information was given by this letter to the employees to whom it was addressed that they would lose any interest they might have in the pension fund to which payments had been made, and were being made, on their behalf. The balloting was completed by 10/26/64.

On November 12, 1964, Sal B. Hoffmann, in his capacity as President of the UIU, wrote similar letters to each of the 36 employers whose employees had voted to switch over to the Teamsters. These letters informed those employers that the Teamsters were step-

---

1. See Document 15.

2. See Document 15, Exhibit C.

ping into the shoes of the UIU for all practical purposes with regard to their employees. The letters also informed the employers that they would "no longer be required to make payments or contributions to the U.I.U. HEALTH and WELFARE FUND and to the U.I.U. National Pension Program which would otherwise become due * * *."[3]

On November 13, 1964, the major points of the oral agreement reached by Messrs. Hoffmann, Bucher and Backus were set down in two separate documents.[4]

On December 1, 1964, the division of the UIU Local 37 took place.

On December 22, 1964, the new Teamsters Local 837 set up a Pension Fund under a Trust Indenture (hereafter referred to as the "Teamsters Local 837 Pension Fund").[5]

It is unclear at what point the members of the new Teamsters Local 837 turned their attention to a pension plan. The record shows that after the new Local set up a pension plan on December 22, 1964, but before February 1, 1965, which was the date of the filing of the present suit, the Trustees of the new pension fund (Local 837 Pension Fund, Document 1, Exhibit A) made a formal demand on the Trustees of the old pension fund (UIU National Pension Program, Document 1, Exhibit B—hereafter called "The UIU Pension Fund") for an allocated portion of the old fund. This demand was refused and has now been renewed in the form of the present suit.

The present controversy is in essence a disagreement on whether or not that portion (called hereafter the "aliquot portion") of the UIU Pension Fund, which was the allocated reserve from contributions for employee pensions by the employers whose employees were transferred to the Teamsters, should be turned over to the Teamsters Local 837 Pension Fund.

19 of the 36 employers whose employees were transferred from the UIU to the Teamsters had contributed for several years to the UIU Pension Fund. Those 19 employers had approximately 1500 employees working for them at the time of the transfer. The UIU Pension Fund exists for the benefit of approximately 38,000 employees. The transferred employees thus represent about 4% of the total employees covered by the UIU Pension Fund. The reserves of the UIU Pension Fund on the date of transfer amounted to approximately $25,000,000. and the Teamsters Local 837 Pension Fund is claiming approximately $1,000,-000. (or about 4%) as the amount properly allocable to it.

Section 301 of the Taft-Hartley Act (29 U.S.C.A. § 185) provides in paragraph (a):

"(a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

The defendants contend that this language is insufficient to give this court jurisdiction. The court cannot agree with defendant's contention for the following reasons. First, the oral agreement of September 1964, which was later reduced to writing, was a contract between two labor unions. Such a contract falls squarely within the language of § 301. Second, there may be sufficient evidence produced at the trial to support a finding that this contract was violated because the contract required the aliquot portion to be set aside in a pension fund for the members of Teamster Local 837.[6] There is nothing in § 301 to preclude a suit on a contract between two

---

3. Document 1, Exhibit E.

4. Document 15, Exhibits A and B.

5. Document 1, Exhibit A.

6. Exhibit A (par. 3) to the affidavit of George Bucher (Document 15), being a summary of the agreement between the UIU and the Teamsters reached on

labor organizations by third-party beneficiaries of such contract.[6a] Although the defendants apparently contend that they would not be bound by such a contract made by the UIU, it is noted that 50% of the governors (four of the nine defendants) are "elected International Officers of the Union selected by the Union and representing employees" (par. A–1 of Article IV of the UIU Pension Trust Indenture, Exhibit B to the Complaint), and that a fifth defendant, Mr. Hoffmann, as Chairman of the Board, may "by consent of all governors present, in person or by proxy * * * cast his vote" in the event of a tie vote (see Article VI, par. a, 5 and s). Further, there seems little doubt that the evidence which might be produced at the trial would justify the use of the court's equitable power to require the defendants to take such action as the court might decree.[7]

It is also possible that the letter of October 19, 1964 (Exhibit C to Document 15), together with the oral agreement which it implemented, constituted an enforceable contractual promise to the employees by UIU binding on its pension committee under principles of promissory estoppel (see § 90 of Restatement of Contracts).

■ Also, although this court may have jurisdiction in this case under § 301, another basis for jurisdiction is available here. Section 302 of the Act (29 U.S.C. § 186) makes all payments by employers to employees or their representatives illegal[8] except those payments specifically exempted in the Act. Thus, at the outset it is clear that unless the UIU Pension Fund can qualify under one of the exceptions listed in § 302, its operation is illegal. The language in § 302 which governs pension funds is 302(c) (5) and the UIU Pension Fund must operate in conformity with that subsection. Section 302(c) (5) provides:

"(c) The provisions of this section shall not be applicable * * * (5) with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents): * * *."

Since the refusal of the Trustees of the UIU Pension Fund to turn over an aliquot portion of the reserves to the

11/13/64, provides that "'Local 37 is to transfer to Teamsters Local 837, 75% of *all* the assets of Local 37, as of November 30, 1964 * * *'" and paragraph 7 of the above Bucher affidavit states that "the assets of Local 37 * * * would be distributed ratably between [Local 837] * * * and * * * Local 37 * * * in direct proportion to the number of employees who would be transferred to the Teamsters Local, compared to the number of employees to remain in U.I.U. Local 37 * * *." The letter of November 12, 1964 (Exhibit E to the Complaint) contains a statement by Mr. Hoffmann that Local 837 will "act in all respects as the successor of our International Union and of our Local 37 * * *." As to the legal significance of the preceding representation on behalf of both unions speaking through Mr. Hoffmann to the employers, compare § 90, Restatement, Contracts.

6a. See Restatement of Contracts, § 133, and Humphrey v. Moore, 375 U.S. 335, at page 359, 84 S.Ct. 363, at page 377, 11 L.Ed.2d 370 (1964), where this language appears: "When it is alleged that the union itself has engaged or acquiesced in such a departure from the collective bargaining agreement, I can see no reason why an individually affected employee may not step into the shoes of the union and maintain a § 301 suit himself." Cf. Falsetti v. Local Union No. 2026 et al., 355 F.2d 658 (3rd Cir. 1966).

7. It is noted that paragraph a of Article IX of the UIU Pension Trust Indenture gives the defendants the right to apply to this court "to cause the selection of" governors in order to assure the proper functioning of the Pension Trust.

8. 29 U.S.C. § 186(a).

Trustees of the Local 837 Pension Fund may be a violation of the above statutory provision, the Complaint cannot be dismissed.

■ The defendants have suggested that § 302(c) (5) exists to allow multi-employer pension plans to use so-called "pooled funds."[9] A pooled fund is simply one large fund contributed to by a number of employers, instead of many smaller funds each contributed to by only one employer. For simplicity of administration and reduction of overall expense, Congress, it seems, allowed employers, by that portion of 302(c) (5) in parentheses, to use pooled funds. But surely it is clear that employers contributing to any pension fund are doing so only for the benefit of their own employees.[10] The fact that the fund benefits as a whole by the commingling of all employer contributions does not overcome the presumption that employers are acting, to an overwhelming extent, in the interests of only their own respective employees when contributing to pooled pension funds.

■ The defendants' argument goes astray when it assumes that since Congress allowed pooled funds, it also allowed employer contributions to be used to the exclusion of their own employees. Such an assumption on the part of the defendants is inconsistent with what appears to be the purpose of § 302.

■ The defendants contend that the UIU Trust Indenture (Document 1, Exhibit B, Article X, B) itself prohibits any vested interest in the fund and, there-fore, an aliquot portion of the UIU Pension Fund cannot be transferred to the Local 837 Pension Fund without violating an admittedly lawful provision of the UIU Trust Indenture. The answer to this contention is twofold. First, the record does not establish conclusively that the "no vesting" provision of the UIU Trust Indenture has been, or will be, violated.[11] Secondly, although "no vesting" provisions do not make a trust indenture invalid under § 302,[12] this does not mean that the trustees of a fund can interpret a "no vesting" provision as permitting that which the law forbids. It would be a contradiction to say that conduct prohibited by § 302(c) (5) could be made lawful by the operation of a "no vesting" clause in a trust indenture.

The defendants have also argued that § 302(e) limits the jurisdiction of this court to such an extent that it is unable to order the relief prayed for in the Complaint. The court sees no such limitation implicit in 302(e). The relevant part of that section provides:

"(e) The district courts of the United States * * * shall have jurisdiction, for cause shown * * * to restrain violations of this section * * *."[13]

■ There are few federal cases which discuss this language. The one appellate decision which the court finds relevant here is Copra v. Suro, 236 F.2d 107 (1st Cir. 1956). In that opinion, Chief Judge Magruder indicates in dictum (at p. 115) that Congress intended,

---

9. Defendants' Brief Sur Motion to Dismiss Complaint (Document 18, p. 45).

10. Cf. Nicoletti v. Essenfeld, 11 Misc.2d 197, 171 N.Y.S.2d 373, at 377 (Sup.Ct. 1958).

11. The UIU Trust Indenture, Article X, B, provides: "No Employer, nor the Union, or any of its subdivisions, has any right, title, interest or claim, legal or equitable, in or to any contributions under this Program, nor shall the Board at any time pay to any employer, the Union or any of its sub-divisions any part of his or its own contributions or any part of the Fund. No employee, Covered Employee, or other person, shall have any right, title, interest, or claim, legal or equitable, in or to any part of the Fund or to contributions under the Program, except to the extent of pensions due and owing therefrom, rights to which shall be governed exclusively by the provisions of the Program."

12. Minkoff v. Scranton Frocks, Inc., 181 F.Supp. 542, 549 (S.D.N.Y.1960).

13. 29 U.S.C. § 186(e).

by enacting § 302(e), to grant broad jurisdiction to the Federal Courts:

"The legislative history suggests to some extent that * * * Congress intended in § 302(e) to create a broad equity jurisdiction that would not only authorize the district courts to forbid the making of payments in violation of § 302(a) and (b), but that would also authorize them to exercise a more general equity power over the welfare funds whose life in effect depends on the permissive exception of § 302(c)(5). The way in which § 302 was presented, however, necessarily causes the legislative history to be lacking in conclusiveness. In both the 79th Congress and the 80th Congress, it came into the consideration of an omnibus labor bill by introduction from the floor of the Senate, so that the committee reports, which usually give the best explanations of how a complicated section is supposed to work, say nothing on the whole subject of § 302 except relatively brief references in minority sections of the reports. There was extensive discussion on the floor, particularly in the Senate, but this history is subject to the usual infirmities, by way of ambiguity, of legislative debates. See, generally, * * * (citing Cong. Rec.)."

Chief Judge Clary, in the case of In re Bricklayers' Local No. 1 of Pa. Welfare Fund, 159 F.Supp. 37 (E.D.Pa.1958), relied on this language in granting a declaratory judgment in that case, arguing that § 302(e) gave the District Courts power to "enjoin" violations of § 302 and, when a declaratory judgment was necessary to that end, the court could order it. Though *Bricklayers* involved a welfare fund, there is no reason on this record why a pension fund should be treated differently. If a transfer of pension funds is required in this case to prevent violations of § 302, this court should order the transfer.[14]

It seems consistent with the policy enunciated by the Supreme Court in Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), to hold in this case that § 302, like § 301 in that case, gives broad jurisdiction to the federal courts. See In re Bricklayers Local No. 1 of Pa. Welfare Fund, supra, 159 F.Supp. at p. 44.

The defendants have objected that the Trustees of Local 837 Pension Plan are not proper parties to this suit under § 302. That section does not specify who may, or may not, be parties but "the legislative history suggests, in a general way, that employees, unions, trustees, and employers were all intended to be afforded the benefit and the liability of the equity jurisdiction over welfare funds, as appropriate in a particular case."[15] In the present case, it is entirely appropriate for the trustees to bring suit. The court has the power to appoint trustees who will effectuate the purpose of the trust. 1 Scott on Trusts, § 108.4, at pp. 795–7; Anderton v. Patterson, 363 Pa. 121, 127, 69 A.2d 87 (1949). The case cited by the defendants on this point, Carroll v. Associated Mu-

---

14. The courts have held that their equitable power should be used to order such transfers from pension funds or trusts under similar circumstances. See Judge v. Kortenhaus, 79 N.J.Super. 574, 192 A.2d 320, 329 (1963); Whelan v. O'Rourke, 5 A.D.2d 156, 170 N.Y.S.2d 284 (Sup.Ct.1958); Nicoletti v. Essenfeld, 11 Misc.2d 197, 171 N.Y.S.2d 373 (Sup.Ct.1958); Conway v. Cross, New York Supreme Court, Special Term, Part I, New York County, April 28, 1959, opinion in letter stapled to back of plaintiffs' brief (Document 17). As to methods of allocating the reserves in a pension fund among those for whom such funds are held, see "Collectively Bargained Multi-Employer Pension Plans," by Joseph J. Melone, pp. 100–103. See, also, Summers, Union Schism in Perspective, 45 Va.L.Rev. 261, 279 and n. 84 (1959), pointing out that "To deprive [a union member of his potential benefits from a pension fund] because he shifts his allegiance to another union would seriously inhibit his freedom of choice, which is central to collective bargaining."

15. Copra v. Suro, supra, 236 F.2d at p. 114.

sicians of Greater New York, 206 F. Supp. 462 (S.D.N.Y.1962), is distinguishable from the present case since those plaintiffs were not trustees.

The defendants insist that the members of Local 837 are not entitled to have the funds in question transferred because they voted to disaffiliate with the UIU and, thus, voluntarily ceased to be "covered employees," as that term is used in the UIU Trust Indenture. The court sees nothing in the present record that would indicate that either the employees or employers involved in this transfer had any knowledge that the transfer would affect future pension benefits. Perhaps they could have known that these benefits would be lost, but the letters of October 19, 1964,[16] and November 12, 1964,[17] from Sal B. Hoffmann gave them no indication of this. On the contrary, the impression those letters give is that a new union is to be substituted for the old one, with little else of consequence changed. The employees and the employers might not have acted as they did had they known that the transfer would so drastically effect future pension benefits.[18]

## ORDER

And now, March 25, 1966, it is ordered that:

(a) paragraph I–2 of the Motion under Rule 12(b) (Document 4) is granted and the Third Count of the Complaint is dismissed; and

(b) in all other respects the Motion under Rule 12(b) (Document 4) is denied.

16. Document 15, Exhibit C:
"President George Bucher has also informed us that the members of this Shop have no objection to being transferred by the Upholsterers' International Union to a Local to be chartered by the International Brotherhood of Teamsters.
"We have decided to ascertain from you whether or not you would have any objection to being transferred to the Teamsters' Union."

17. Document 1, Exhibit E:
" * * * we will transfer and assign to said Local 837 all our rights and obligations under our collective bargaining agreement * * * and Local 837 has agreed * * * to act in all respects as the successor of our International Union * * *."

18. The Brief Amicus Curiae of Intervenor Plaintiffs Howell Mfg. Co. and Robert John Mfg. Co. in Opposition to Defendants' Motion to Dismiss the Complaint has been filed as Document 19.