**In The Matter of the Arbitration of the TYPO–PUBLISHERS OUTSIDE TAPE FUND.**

**No. 72 Civ. 99.**

United States District Court,
S. D. New York.

June 26, 1972.

Lorenz, Finn, Giardino & Lambos, by C. P. Lambos and Jacob Silverman, New York City, for petitioner J. G. S. Christensen.

Vladeck, Elias, Vladeck & Lewis, by Stephen C. Vladeck, New York City, for New York Typographical Union No. 6, Bertram A. Powers and David W. Crockett, Union Trustees.

John J. Stanton, Jr., New York City, for The New York Times Co. and John Bogart, Employer Trustee.

Sidney Orenstein, New York City, for New York Post Corp. and Leonard Arnold, Employer Trustee.

## OPINION

TYLER, District Judge.

This litigation arises from a proposal of the union trustees of the Typo-Publishers Outside Tape Fund (the "Fund") to utilize Fund assets to the benefit of union members not employed by publishers contributing to the Fund. The trustees representing the contributing publisher employers opposed this proposal, and, pursuant to the trust agreement, the issue was submitted to arbitration.

The arbitrator found that under the collective bargaining and trust agreements, Fund assets could be used to provide benefits to union members employed by publishers who had never contributed to the Fund. The arbitrator now petitions the court for a declaratory judgment, pursuant to 28 U.S.C. § 2201, that payments made by the Fund to employees of noncontributing employers pursuant to his award of August 4, 1971 are not in violation of § 302 of the Labor Management Relations Act, 29 U.S.C. § 186 (hereinafter referred to as "§ 302"). Petitioner also moves for an order confirming his award and directing the Fund trustees to implement its provisions.

■ ■ The question of validity under federal law of an arbitration award requiring a labor trust fund to make specified payments to union members is a controversy which can be adjudicated pursuant to the provisions of the Declaratory Judgment Act, 28 U.S.C. § 2201. International Longshoremen's Association v. Seatrain Lines, Inc., 326 F.2d 916 (2d Cir., 1964). As it also appears that an arbitrator has standing to seek a judgment confirming the validity of his award in light of § 302, In re Trustees of Operating Engineers, etc., 303 F. Supp. 1126 (N.D.Cal., 1969), this court assumes subject matter jurisdiction of this case.

The controversy that precipitated this litigation began in 1963. At that time the New York Publishers' Association, as the representative of the publishers of daily newspapers in the New York metropolitan area,[1] informed New York Typographical Union No. 6 (the "union") that certain publishers wanted to use outside tape in their composing rooms. It was apparent to the union that the use of tape set outside of the publishers' plant to set stockmarket quotations in daily newspapers would reduce the number of shifts to be worked by its members.

1. With the exception of The New York Post Corporation.

As a result of these apprehensions, the union entered into negotiations with the Publishers Association. In these negotiations, it was agreed that a portion of the labor expenses saved by the publishers through the use of outside tape should enure to the union members whose employment possibilities would be impaired by its introduction. Accordingly, subsequent collective bargaining agreements have provided that any employer who uses outside tape must establish and make payments to an outside tape fund to be jointly administered by it and the union.

Prior to 1967, four separate outside tape funds were established between the union and publishers who chose to utilize outside tape. In 1967, after the demise of two of the four contributing publishers, the four separate funds were consolidated into a "single city-wide Typo-Publishers Fund" to be jointly administered by the union and the contributing publishers. Since 1967, only two metropolitan publishers, the *New York Times* and the *New York Post*, have utilized tape and made contributions to the consolidated Fund.

In 1970, three years after the creation of the consolidated fund, a dispute arose between the union trustees and the trustees representing the contributing employers. The union trustees, contending that all typographical workers were affected by the use of outside tape at the *New York Times* and the *New York Post*, proposed utilization of trust funds created by contributions from those publishers to provide certain benefits to all union members whether or not employed by the *Times* or the *Post*. The trustees representing those two papers opposed this proposal on the grounds that under their collective bargaining agreements, the trust agreement, and § 302, their contributions to the Fund could be utilized only for the benefit of past or present employees of their companies. In accordance with the provisions of the trust agreement, this dispute was submitted to arbitration. By the terms of the submission, the arbitrator was empowered to decide whether the collective bargaining agreements and the trust agreement would permit Fund assets to be so utilized. Decision upon the issue of the legality of the union proposal vis a vis § 302 was expressly reserved for decision by this court. The arbitrator found for the union trustees on the first two questions and now presents the latter issue for judicial approval.

■ Section 302(a) of the Labor Management Relations Act prohibits payment by an employer of " . . . any money or other thing of value" to a labor union representing its employees. Sections 302(c) (5) and (6) provide that the § 302(a) proscription will not apply to payments made by an employer " . . . to a trust fund established by [a union], for the sole and exclusive benefit of the employees of such employer." 29 U.S.C. § 186(c) (5).[2] The courts have consistently interpreted § 302(c) (5) as meaning that "[o]nly employees and former employees of employers who are lawfully contributing to a union pension trust fund may qualify as beneficiaries of a Section 302 trust." Moglia v. Geoghegan, 403 F.2d 110, 116 (2d Cir., 1968). This interpretation, when applied to union trust funds established by an industry-wide union and a multiple employer group to which all employers do not contribute, precludes such funds from using their assets to benefit union members who are employees of non-contributing employers. Rittenberry v. Lewis, 238 F.Supp. 506 (E.D.Tenn., 1965); Bolgar v. Lewis, 238 F.Supp. 595 (W.D.Pa., 1960). Inasmuch as the award in this case seeks, in a similar situation, to use trust funds to benefit employees who are not and never

---

2. The § 302(c) (6) exception does not recite the phrase quoted above or, indeed, any of the limitations found in § 302(c) (5). Section 302(c) (6), however, was intended only to expand the scope of valid trust purposes and the limitations contained in § 302(c) (5) are deemed incorporated into § 302(c) (6). Blassie v. Kroger Co., 345 F.2d 58, 74 (8th Cir., 1965).

have been employees of contributing employers, implementation of the award would violate § 302(a).

The proponents of the award, the union and the arbitrator, do not seriously quarrel with this principle of law, but argue that if the court took an expansive view of the term ". . . employees of such employer", see Blassie v. Kroger Co., 345 F.2d 58 (8th Cir., 1965), the benefits conferred by the award to the entire union membership would come under the § 302(c) (5) exception. In making this argument, the proponents rely principally upon Bey v. Muldoon, 223 F.Supp. 489 (E.D.Pa., 1963), aff'd 354 F.2d 1005 (3d Cir.), cert. denied 384 U.S. 987, 86 S.Ct. 1888, 16 L.Ed.2d 1004 (1966), which held that, under the circumstances of that case, funds contributed by a single employer to a union trust fund pursuant to a multi-employer collective bargaining agreement could be used for the benefit of union employees who were not and never had been employees of the contributing employer. In arriving at this decision, the court relied heavily upon ". . . the peculiar demands of the stevedoring industry" on the Philadelphia waterfront. Id. at 496. The "peculiar demands" of that industry were found primarily in the waterfront hiring practices, i. e. where "[a] longshoreman goes every day to a 'shape-up'. If there is work, he works; if there is not, he doesn't . . . [A] longshoreman may work for one [employer] on Monday, another on Tuesday, and a third on Wednesday." Id. at 492. The "peripatetic" nature of employment on the Philadelphia waterfront led the court to conclude that "a longshoreman is the employe of the waterfront and the waterfront is his employer." Id. at 494. This critical finding supported the court's holding "that longshoremen work for every stevedore, and that the stevedores as a group should be considered as the 'employer' in applying § 302(c) (5)." Id. at 494–495.

Despite the fact that this liberal construction of the § 302(c) (5) exception has not been expanded beyond the confines of the Philadelphia waterfront, the proponents of the award *sub judice* urge its applicability to typographical workers in the New York newspaper publishing industry. In support of this position, it is their contention that because of similarities between employment practices as they relate to typographical workers and those encountered on the Philadelphia waterfront, the reasoning of the *Bey* court is controlling here.

Although it should have been apparent that the validity of the award would rest upon a factual finding of similarity between employment practices in these disparate industries, counsel have devoted remarkably little attention to developing evidence on this point before the arbitrator or this court. Thus, the record may well be incomplete in this regard. Nonetheless, it does contain enough evidence to support a tentative conclusion that there are sufficient dissimilarities between the employment practices in newspaper publishing and the stevedoring industry to render Bey v. Muldoon, *supra*, inapposite to this case. Such evidence is contained in an affidavit verified by Bertram Powers, president of the union. Mr. Powers has stated therein that all typographical workers are divided into two employment categories according to their seniority. Those workers enjoying the greatest seniority are termed "situation holders." Situation holders are employed by newspaper publishers on a permanent full-time basis. Typesetters with less seniority are "substitutes". In order to obtain employment, substitutes place their names on a "slip board" at the newspapers at which they desire employment. As positions become available due to illness of situation holders or to expanded newspaper editions, substitutes are called in to work at the paper at which they have "slipped up." Upon retirement of a situation holder, the most senior substitute on the slip board at that time is offered a permanent situation.

Although at first blush these procedures might appear to correspond to a

waterfront "shape-up", several features of the system suggest otherwise. First, the great majority of typographical workers are permanent situation holders. For example, at the *New York Post*, 87% of the composing room employees are situation holders, and only 13% are substitutes or workers not employed on a full-time basis. It should also be noted that the publishers are required, by sections 28 and 29 of their respective collective bargaining agreements, to reduce the use of substitutes to a minimum and to create permanent situations to meet normal employment requirements. The picture thus presented by actual practice as well as by the collective bargaining agreements is hardly that of a typical waterfront "shape-up".

Nor can it be maintained that the hiring of "substitutes" approximates a waterfront shape-up for, under the rules of the union, substitutes can register or "slip-up" at only one newspaper at a time. It further appears that a substitute's "priority" for a permanent situation is determined, in part at least, by the length of his registration at a given newspaper. Thus, the requirement that substitutes offer their services to one employer at a time, coupled with the benefits to be derived from a continuing registration with a single employer, lead me to conclude that substitutes are hardly the "peripatetic workers" found in *Bey* on the Philadelphia waterfront.

On the record as presently constituted, petitioner has failed to establish that typesetters work for every publisher and that publishers as a group should be considered as the employer in applying § 302(c) (5). Since the proposed payments would confer benefits upon union employees not "employees of such employer", the § 302(c) (5) exception would not apply to the award and its implementation would violate § 302(a). Accordingly, the arbitrator's petition must be denied.

This is not to say, however, that additional evidence might not show otherwise. Accordingly, the denial of the petition is without prejudice to its reinstitution within 21 days of the filing of this memorandum, at which time the interested parties would be allowed to introduce further evidence showing that employment practices in the New York newspaper publishing industry more closely approximate those found on, for example, the Philadelphia waterfront. If, after 21 days, counsel have not informed chambers of the undersigned of their intent to produce additional evidence, the tentative denial of the petition will become final, and this court will sign and enter any appropriate order to such effect which may be submitted. It is so ordered.