Andrew CRAWFORD et al.

v.

John CIANCIULLI et al.

Civ. A. No. 72–1877.

United States District Court,
E. D. Pennsylvania.

March 26, 1973.

**360**

Howard J. Casper, Philadelphia, Pa., for plaintiffs.

John R. McConnell, Philadelphia, Pa., for defendants.

### MEMORANDUM AND ORDER

HUYETT, District Judge.

The issues raised by the facts in this case focus sharply on one of the most recurring problems facing labor management relations in the United States to-day—the loss of pension benefits by hundreds of thousands of American workers after many years of reliance and expectations of security after retirement. Instances of lost pension benefits caused by plant closings, business cessations, lay-offs and other factors beyond the control of the employee are of disturbing proportions. Hardships caused individual employees and the dislocations caused society by loss of pension benefits are severe and are a cause for concern by responsible persons. Methods of avoiding these hardships and disclocations have been the subject of inquiry by Congress during the past three years, and a Bill providing means towards solving and seeking to avoid the problems caused by loss of pension benefits has only recently been introduced in the Ninety-Third Congress. (S4) [1]

In addition, commentators have criticized the courts for being unnecessarily restrictive and unrealistic in the interpretation given pension fund agreements with the result that many employees are left financially insecure in their later years of life. *See* M. Bernstein, Employee Pension Rights When Plants Shut Down: Problems and Some Proposals, 76 Harv.L.Rev. 952 (1963). And they have exhorted the courts to be more imaginative in dealing with problems raised by lost pension benefits. *See* N. Levin, Proposals to Eliminate Inequitable Loss of Pension Benefits, 15 Vill.L. Rev. 527 (1970); Note, 70 Col.L.Rev. 909 (1970). One proposal has been that federal courts establish a federal common law pertaining to union-management negotiated pension fund agreements premised jurisdictionally on § 301 of the Labor Management Relations Act, as amended, 29 U.S.C. § 185 (1970) similar to the federal common law over collective bargaining agreements which evolved as a result of the Supreme Court's decision in Textile Workers v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 923, 1 L.Ed.2d 972 (1957). *See* P.

1. See 119 Cong.Rec. S 28 (daily ed. Jan. 4, 1973); 118 Cong.Rec. S 17728 (daily ed. Oct. 12, 1972); 118 Cong.Rec. S 7603 (May 11, 1972); Committee on Labor and Public Welfare, S.Rept. 92–1150.

Thompson, Mergers, Dissolutions and Transfers, 9 Textbook For Welfare, Pension Trustees and Administrators 440, 443 (1967). This proposal would free federal courts to a far greater degree than is possible at this time from restrictive state court decisions which rely solely on contract principles in interpreting pension fund agreements. *See*, e. g. Schneider v. McKesson & Robbins, Inc., 254 F.2d 827 (2 Cir. 1958); Knoll v. Phoenix Steel Corp., 325 F.Supp. 666, 669 (E.D.Pa.1971), aff'd. 465 F.2d 1128 (3 Cir., filed August 25, 1972), cert. denied 409 U.S. 1126, 93 S.Ct. 941, 35 L.Ed.2d 257 (1973); George v. Haber, 343 Mich. 218, 72 N.W.2d 121 (1955); Gorr v. Consolidated Foods Corp., 253 Minn. 375, 91 N.W.2d 772 (1958); Green v. Copco Steel and Engineering Co., 22 Mich.App. 16, 176 N.W.2d 690 (1970).

■ Without guidance by the Supreme Court we do not have authority to establish such a federal common law for union-management negotiated pension fund agreements. We are not required, however, to ignore the consequences of pension fund disruptions on federal interests in labor-management relations. As the Supreme Court noted in Lewis v. Benedict Coal Corp., 361 U.S. 459, 468, 80 S.Ct. 489, 495, 4 L.Ed.2d 442 (1960): "It is a commonplace of modern industrial relations for employers to provide security for employees and their families to enable them to meet problems arising from unemployment, illness, old age or death." And, although pension benefits for already retired employees is not a mandatory subject of collective bargaining as "terms and conditions of employment" within the meaning of §§ 8(a)(5) and 8(d) of the National Labor Relations Act, Allied Chemical and Alkali Workers of America, Local Union No. 1 v. Pittsburgh Plate Glass Co., Chemical Division, 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971), pension benefits for active employees is a mandatory subject of collective bargaining. *Id.* 404 U.S. at 159, 92 S.Ct. 383. In the case before us we are not only concerned with the rights of employees who are retired, but also with the apprehensions of active employees in respect to retirement benefits. It is in this light then that we proceed to the facts and issues in the case before us.

I

Plaintiffs, the Union Members of the Pension Committee of the Philadelphia Bakery Employers and Food Driver Salesmen, Dairy and Ice Cream Workers Union, Local No. 463 and Teamsters' Union Local No. 676 Pension Plan, seek a permanent injunction restraining defendant Jules Junker, Secretary of the Pension Committee, from refusing to approve pension applications and payments pursuant to already approved pension applications for former employees of Louis Burke, Inc. and Wm. Freihofer Baking Company. Plaintiffs contend that the defendant's action violates the terms of the Pension Fund Agreement, and constitutes a breach of defendant's fiduciary duties as a member of the Pension Committee. Plaintiffs assert juridiction under § 301(a) of the Labor Management Relations Act as amended 29 U.S.C. § 185(a) (1970) (Act).[2] Defendants, Employer Committee Members of the Pension Fund Agreement, in an amended answer counterclaim seeking a permanent injunction ordering plaintiffs to join with the defendants in instructing the Administrator of the Pension Fund (Fund) to make no further payments to former employees of employers who have ceased making contributions to the Fund the value of whose past contributions to the Fund have been "exhausted". Defendants contend that

2. Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

making these payments would be: (1) in violation of § 302 of the Labor Management Relations Act, as amended 29 U.S.C. § 186 (1970),[3] (2) contrary to the provisions of the Pension Fund Agreement[4] and (3) an improper, un-

3. Section 302(a) of the Act provides: "It shall be unlawful for any employer . . . to pay . . . or agree to pay . . . any money . . . (1) to any representative of any of his employees who are employed in any industry effecting commerce. . . ."

Section 302(c)(5) provides as follows: "The provisions of this section [making it unlawful for the employer to deliver and a representative of the employees to receive anything of value] shall not be applicable . . . with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents): Provided, That (A) such payments are held in trust for the purpose of paying, either from principal or income or both, for the benefit of employees, their families and dependents, for medical or hospital care, pensions on retirement or death of employees, compensation for injuries or illness resulting from occupational activity or insurance to provide any of the foregoing, or unemployment benefits or life insurance, disability and sickness insurance, or accident insurance; (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund, together with such neutral persons as the representatives of the employers and the representatives of the employees may agree upon and in the event the employer and employee groups deadlock on the administration of such fund and there are no neutral persons empowered to break such deadlock, such agreement provides that the two groups shall agree on an impartial umpire to decide such dispute, or in event of their failure to agree within a reasonable length of time, an impartial umpire to decide such dispute shall, on petition of either group, be appointed by the district court of the United States for the district where the trust fund has its principal office, and shall also contain provisions for an annual audit of the trust fund, a statement of the results of which shall be available for inspection by interested persons at the principal office of the trust fund and at such other places as may be designated in such written agreement; and (C) such payments as are intended to be used for the purpose of providing pensions or annuities for employees are made to a separate trust which provides that the funds held therein cannot be used for any purpose other than paying such pensions or annuities."

"Any person who willfully violates any of the provisions of this section shall, upon conviction thereof, be guilty of a misdemeanor and be subject to a fine of not more than $10,000 or to imprisonment for not more than one year, or both." Section 302(d).

4. Specifically, defendants contend that payments to employees of employers would violate § 11 of the Agreement which provides as follows:

"11.1 An Employer shall cease to be a party to this Agreement upon
a. Ceasing for any reason to be engaged in business;
b. Ceasing to have any Employees who are represented by either of the Unions;
c. Failure to make the contributions to the Fund provided for in Section 7 above within such period as the Committee shall fix.

11.2 The Committee shall determine the date as of which an Employer shall be deemed to have ceased to be a party to this Agreement for any of such reasons and no Employer shall be released from liability for contributions accruing prior to the date so determined.

11.3 If an Employer shall cease to be a party to this Agreement for one of the reasons specified in Subsection 11.1(a) and (b) above, the Committee shall cause an evaluation to be made of that portion of the Fund which was attributable to the contributions made by the Employer so ceasing to be a party. That portion of the Fund, after provision for administrative expenses, shall be allocated on the basis of an actuarial valuation as follows:
a. First, there shall be an allocation to provide, so far as possible, the payments due to Pensioners who shall have retired from the employment of such Employer and the payments due to the Employees of such Employer entitled to pensions under Section 2 or Section 3 above were they to retire on the date as of which such Employer ceased to be a part to this Agreement;
b. Second, any balance then remaining shall be allocated to cover, as far as

lawful and unfair diversion and dissipation of funds held for the benefit of former employees and employees of employers making contributions to the Fund.

Before a hearing could be held on the requests by the parties for injunctions, the plaintiffs filed a motion for the appointment of an impartial umpire to decide the following issue upon which the Committee Members deadlocked at a meeting held on October 25, 1972:

"MOTION was made and seconded that the Pension Committee Members be instructed that all litigation concerning Section 11 of the Plan, more particularly, the suit presently before the Federal District Court for the Eastern District of Pennsylvania, be

stayed for a minimum period of six months to permit a change in investment counselling and to review the Fund financing during the specified period.

During the specified period, all Pension payments due will be paid.

The Committee Members are directed to consult with counsel and immediately enter into a stipulation for presentation to the Court regarding the terms indicated above."

Plaintiffs contend we have jurisdiction under § 302 of the Act to appoint an umpire to resolve the deadlocked issue even though § 9.3 of the Pension Fund Agreement provides that deadlocked issues be decided by an impartial third

possible, the cost of benefit credits accrued to the date as of which such Employer shall have ceased to be a party to this Agreement of all the then Employees of such Employer other than those then entitled to pension under Section 2 or Section 3 were they then to retire.

11.4 If any Employer shall cease to be a party to this Agreement by reason of failure to make the contributions to the Fund provided for in Section 7 above within such period as the Committee shall fix, there shall be allocated from the Fund, on the basis of an actuarial valuation, the amount required to provide the payments due to Pensioners who shall have retired from the employment of the Employer so ceasing to be a party to this Agreement and to provide the payments due to any Employees of such Employer were they to retire on the date on which such Employer ceased to be a party to this Agreement; provided, however, that the total amount allocated under this Subsection 11.4 shall not be in excess of that portion of the Fund which was attributable to the contributions made by such Employer. No other Employee of such Employer shall thereafter have any rights or benefits under this Agreement unless he shall be employed by another Employer within three (3) months after the date as of which such Employer shall have so ceased to be a party to this Agreement. If a person is so employed by another Employer, he shall be deemed an Employee with the

same total credited service as if his employment had not been interrupted by reason of the fact that his Employer so ceased to be a party to this Agreement.

11.5 If any group of Employees of any Employer shall cease to be represented by one of the Unions without change in job classifications a valuation of a portion of the Fund and allocations to provide payment shall be made in the same manner as is provided in Subsection 11.3 above, and the Employer of such Employees shall thereafter cease to be a party to this Agreement so far as relates to such Employees.

11.6 When an allocation shall have been made in any of the cases provided for above, the Committee shall determine whether to administer the portion so allocated through the Trustee or to liquidate that portion of the Fund and direct the application of the proceeds to the purchase from an insurance company of immediate or deferred annuities in whatever amounts the monies so allocated will provide, the share of each individual being reduced proportionately if the portion of the Fund so allocated shall not be sufficient to provide the benefits which would accrue by reason of the credited service earned to the date as of which such Employer ceased to be a party to this Agreement, except that, if possible, provision shall first be made for the payment of amounts due to Pensioners who shall have retired from the employment of such Employer."

person appointed by the American Arbitration Association.[5] We are urged by the plaintiffs not to resolve the issues raised by the complaint and counterclaim until the above deadlocked issue is resolved by an umpire appointed by us.

Thus, we have before us the following three matters: (1) plaintiffs' complaint seeking an injunction restraining defendant Jules Junker from refusing to approve pension applications and payments for pensions already approved by the Committee, (2) defendants' counterclaim seeking an injunction preventing any further payments for pensions, either already approved or that may be approved in the future, to employees of employers who have ceased making contributions to the Fund and the value of whose past contributions have been "exhausted", and (3) plaintiffs' request that the above issues not be determined until an umpire appointed by us resolves the issue over which the parties deadlocked at their October 25, 1972 meeting. Virtually all facts in the case have been stipulated to by the parties; the remaining facts have been adduced at hearings held on the parties' requests for injunctions and for the appointment of an umpire. This opinion serves as our findings of fact and conclusions of law for purposes of Fed.R.Civ.P. 52.

## II

The Pension Fund Agreement, effective August 1, 1955, provides retirement and disability pensions for employees of employers who were parties to the Agreement and whose employees were included in the collective bargaining unit represented by the Unions on the effective date of the Agreement or any time thereafter. The amount of pension or disability benefits available depends, among other factors, on the number of years of continuous employment with an employer ("credited service"), and on whether the employee was in the employ on the effective date of the Agreement or any time thereafter of one of the employers who began to contribute to the Pension Fund prior to January 1, 1960 and who was in one of the Unions' bargaining units. (Class 1 employee). Pensions payable to employees of employers who began contributing to the Fund on or after January 1, 1960 (Class 2 employees) are based on a proportion of the pension payable to a Class 1 employee. Generally an employee is eligible for a pension if (1) he has reached his 62nd birthday (Normal Retirement), with at least 15 years of Credited Service, or (2) he has reached his 59th birthday (Early Retirement), with at least 15 years of Credited Service. "Credited Service" may be lost for a number of reasons including, for example, termination of employment by reason of dismissal for cause, resignation or quit, and termination of employment by reason of reduction in work force, if the employee does not return to work with an employer who is a party to the Agree-

5. "9.3 The Committee shall determine all matters of policy and all questions arising in connection with the interpretation, application or administration of this Agreement. Its decisions or actions in respect thereof shall be conclusive and binding upon any and all persons and parties. A quorum of the Committee for the transaction of business shall consist of not less than half of the members designated by the Employers and not less than half of the members designated by the Unions. Action shall be taken by the vote of a majority of those present, provided that the Employer members shall vote as a unit with the same number of votes as the number of Union members present at the meeting, and each Union member present shall have one vote. If the Committee should fail to agree on any such question, it shall be referred within thirty (30) days from the date of disagreement to an impartial third person to be chosen by the American Arbitration Association upon the application of the Employers or of the Unions. Such third person, whose fees and expenses shall be paid from the Fund, shall determine such question but shall have authority only to interpret and apply the provisions of this Agreement and shall not have authority in any way to alter, add to or subtract from such provisions."

ment within a designated period of time after termination of employment.

The Agreement also provides a Lump Sum payment to an employee who terminates his employment for any reason other than death or retirement. A maximum amount of one thousand dollars ($1,000) can be paid in a Lump Sum benefit depending on the number of years of credited service. An example illustrates this provision: Assume that an Employee's first date of employment was January 1, 1955 and that he leaves employment on January 1, 1965, having accumulated ten years of Credited Service. His Lump Sum Benefit would be $100 multiplied by 5 years (10 years minus 5 years) or $500. In addition, the Agreement provides that an employee's right to a pension becomes "vested" having accumulated thirty (30) years of credited service even though an employee has not met the age requirements for normal or early retirement. An employee who has vested credited service will receive the normal or early retirement benefits upon reaching the age for those benefits even though the employee resigns upon acquiring the "vested" credited service.

Section eleven (11) of the Agreement provides for termination of an employer as a party to the Agreement when the employer (1) ceases for any reason to be engaged in business, (2) ceases to have any employees who are represented by the Unions, or (3) fails to make contributions to the Fund within a period fixed by the Committee. When the employer ceases to do business or the employees are no longer represented by a Union party to the Agreement, an evaluation is made of the portion of the Fund attributable to the contributions made by that employer. An allocation is then made to Pensioners of the employer, to employees who would otherwise be entitled to a pension were they to retire at the date of the employer's cessation of business, and any balance to the employees of the employer according to the costs of benefit credits accrued. When an employer ceases to make contributions to the Fund, an allocation is made from the Fund in an amount to pay pensions to employees who have retired or who would be entitled to a pension were they to retire on the date the employer ceases to be a party to the Agreement. In the latter case the amount allocated to pensioners and employees of employer ceases to be a party to the Agreement is not to be in excess of the portion of the Fund attributable to the contributions made by that employer. And no other employee of that employer has any right to benefits under the Agreement unless he is employed by another employer within three (3) months after the date the employer ceased being a party of the Agreement. If the employee is reemployed within the three-month period, he is deemed an employee with the same total credited service as if his employment had not been terminated. Payments to the Fund are required by Article XXII of the collective bargaining agreement negotiated by the Employer Association and the Unions, and an employer's liability under the Agreement is limited to the extent of his contribution commitment.

Louis Burke, Inc. ceased doing business in 1968; Wm. Friehofer Baking Co. ceased doing business in 1972. At a meeting of the Pension Committee held on September 21, 1972, defendant Jules Junker, Secretary of the Pension Committee and an employer member, indicated he would not on or after October 1, 1972 approve any new applications from or any payments to any person formerly employed by the Wm. Friehofer Baking Co. No applications can be acted upon or checks drawn and delivered unless first approved by the Secretary and a majority of the Committee. As a result of defendant Junker's action, five former employees of the Wm. Friehofer Baking Co. who have retired from gainful employment have not received benefits. Although considered illegal by the defendants, payments continue to be made to former employees of Burke and Friehofer whose pension applications had been approved before the September

21, 1972 Committee meeting. It has been stipulatd by the parties that all contributions made by Louis Burke, Inc. and Wm. Friehofer Baking Co. to the Fund together with all interest earned thereon and all sums constituting dividends and realized and unrealized capital gains thereon, after charging of administrative expenses, had been and were "exhausted" as of October 13, 1972.

### III

Plaintiffs contend that defendant Junker's action in refusing to approve the pension applications and maintaining that it is illegal to make payment to retirees of Burke and Friehofer violates the terms of the Pension Fund Agreement because the only qualifications for a pension are those involving years of service, age and other similar factors. In addition, plaintiffs contend that even if § 11 of the Pension Fund Agreement does grant the defendant authority to terminate pensions when the employer of an employee has ceased doing business and the portion of the Fund attributable to that employer has been "exhausted", § 11 should not be enforced because defendants are estopped from asserting it. Failing this, plaintiffs argue that § 11 should be declared unreasonable and arbitrary on its face as a trust provision and as it is applied to those employees who have otherwise met the qualifications for retirement. Jurisdiction to consider these issues is asserted under § 301 of the Act.

 Insofar as the complaint raises issues involving a *violation* of the Pension Fund Agreement we have jurisdiction under § 301. *See* Smith v. Evening News Association, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962); Retail Clerks International Association v. Lion Dry Goods, Inc., 369 U.S. 17, 82 S.Ct. 541, 7 L.Ed.2d 503 (1962); Local 33, International Hod Carriers Building and Common Laborers' Union of America v. Mason Tenders District Council of Greater New York, 291 F.2d 496 (2 Cir. 1961); Knoll v. Phoenix Steel Corp., *supra*; Smith v. DCA Food Industries, 269 F.Supp. 863 (D.Md.1967); Burlesque Artists Association v. American Guild of Variety Artists, 187 F. Supp. 393 (S.D.N.Y.1958). This is the case even though suit is not brought by a party to the Pension Fund Agreement, *but cf.* Bowers v. Ulpiano Casal, Inc., 393 F.2d 421, 423 (1 Cir. 1968). But the plaintiffs do claim rights arising from the Pension Fund Agreement. Smith v. Evening News Association, *supra.* The plaintiffs as members of the Pension Fund Committee claim the right to continue to receive payments from employers who have not ceased doing business. In effect the Union Committee members are asking for a declaratory judgment, 28 U.S.C. § 2201 (1970), of their rights and duties under the Pension Fund Agreement which they are bound to follow. They claim the defendants are violating the Agreement pursuant to an incorrect interpretation of that Agreement. We do not consider it necessary that we defer resolution of the issue before us until an employee who has been denied his pension benefits because of the defendants' action or until the Unions themselves bring suit. All that is required for jurisdictional purposes under § 301 is that the Pension Fund Agreement be considered a "contract" within the meaning of that section, Retail Clerks v. Lion Dry Goods, Inc., *supra,* and that the plaintiff, asserting a right under the contract, allege a violation of the Agreement and not simply a breach of fiduciary duties under the Agreement.

 Our conclusion that § 301 gives federal courts jurisdiction over suits by the Pension Fund Committee members alleging breach of a Pension Fund contract established pursuant to a collective bargaining contract is buttressed by Allied Chemical and Alkali Workers of America, Local Union No. 1 v. Pittsburgh Plate Glass Co., Chemical Division, 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971). In *Allied Chemical* the Court held that retirees' benefits are not, within the meaning of §§ 8(a)(5) and 8(d) of the National Labor Relations Act as amended 29 U.S.C. §§ 158(a)(5)

and 158(d), a mandatory subject of bargaining as "terms and conditions of employment" of the active employees remaining in the bargaining unit, although the employees' own future retirement plans are mandatory subjects of collective bargaining. In so holding, however, the Court noted that retirees are not left unprotected from changes made to their pension plans:

> This does not mean that when a union bargains for retirees—which nothing in this opinion precludes if the employer agrees—the retirees are without protection. Under established contract principles, vested retirement rights may not be altered without the pensioner's consent. See generally Note, 70 Col.L.Rev. 909, 916–920 (1970). The retirees, moreover, would have a federal remedy under § 301 of the Labor Management Relations Act for breach of contract if his benefits were unilaterally changed. *See* Smith v. Evening News Assn., 371 U.S. 195, 200–201, 83 S.Ct. 267, 270–271, 9 L.Ed.2d 246 (1962); Lewis v. Benedict Coal Corp., 361 U.S. 459, 470, 80 S.Ct. 489, 495, 4 L.Ed.2d 442 (1960).

*Id.* 404 U.S. at 181, 92 S.Ct. at 399 n. 20. As fiduciaries the plaintiffs have the obligation to protect the retiree's right insofar as the right asserted is a violation of the Agreement and not simply a violation of fiduciary duties arising from the Agreement. Thus, we have jurisdiction under § 301 to consider a claim that defendants' action violates the Pension Fund Agreement.

We disaffirm, however, any intention to assert jurisdiction over matters involving the fiduciary duties of the Pension Fund Committee members. These are not matters concerning violations of a contract. Bowers v. Ulpiano Casal, Inc., *supra*. At times there may be difficulty in distinguishing whether a complaint alleges a violation of a pension fund agreement or a breach of fiduciary duty. Thus, in the case before us it is not clear whether the allegation that § 11 be struck as unreasonable and arbitrary is an allegation that actions taken pursuant to § 11 are violations of the contract or involve violations of fiduciary duties. In view of the disposition we take of the issues before us we need not clearly distinguish at this time the allegations of the complaint. Nor, in light of the disposition of the issues before us, do we need to consider whether we have pendant jurisdiction over claims involving breach of fiduciary duties. *See* United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

However, before we can proceed to the merits of whether the defendants' actions violate the Pension Fund Agreement, we must first determine (1) the issue raised by the counterclaim concerning the legality under § 302 of the Act of payments made to a trust fund established by an employee representative when the trust fund provides benefits to employees of employers who have ceased contributing to the Fund and the value of whose payments have been "exhausted", and (2) assuming benefits can still be paid to employees of Burke and Friehofer, whether the parties must submit to arbitration in accordance with the Pension Fund Agreement the issues concerning the reasonableness of § 11, the meaning to be given § 11 and whether the defendants are estopped from exerting § 11 to deny pension benefits. It is to these issues that we now turn. It is obvious from this approach that we have rejected the plaintiffs' request to delay deciding the above issues until the issue concerning which the parties deadlocked at their October 25th meeting is first decided by an arbitrator. Our reading of the October 25th resolution is that an arbitrator would be required to decide whether the Committee members of the trust should be required to allow allegedly illegal payments be made while a review of trust counselling is undertaken. "There is no doubt that an arbitrator's award cannot compel an illegal act. Minkoff v. Scranton Frocks, Inc., 181 F. Supp. 542, 547 (S.D.N.Y.)." Doyle v.

Shortman, 311 F.Supp. 187 (S.D.N.Y.) (1970). Therefore, we will proceed to adjudicate the issues as outlined above.

## IV

As previously noted § 302 makes it unlawful for an employer to deliver and for a representative of employees to receive anything of value except under § 302(c)(5) "with resect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of employees of such employer . . . (or of such employees . . . jointly with the employees of other employers making similar payments . . . .)" provided, among other conditions, that "such payments are held in trust for the purpose of paying, either from principal or interest or both, for the benefit of employees, . . for . . . pensions on retirement or death of employees. . . . " Defendants contend that a trust fund originally established in strict conformity with § 302(c)(5) no longer qualifies as a lawfully established fund to which an employer may make payments if benefits are paid from the fund to employees of employers who have ceased contributing to the fund and the value of whose past contributions to the Fund have since been "exhausted". Exhaustion of funds apparently arises when the amount of contributions made in the past by the currently non-contributing employer, in addition to any interest, dividends, realized or unrealized gain less administrative expenses, have been completely paid out of the trust fund to the employees of the currently non-contributing employer. An employee of a currently non-contributing employer apparently is a person who was employed by a currently non-contributing employer either on the date the employee applied for his pension or on the date the currently non-contributing employer ceased making contributions to the Fund if the employee has not since obtained employment with a currently contributing employer. The metamorphosis from a lawful to an unlawful § 302(c)(5) trust fund upon continued payments from the fund to employees of currently non-contributing employers whose contributions have since been exhausted results, the defendants assert, from the policy of the Act that contributions of an employer to a § 302(c)(5) fund be used only for the benefit of that employer's former (retired) or present employees. This policy, defendants contend, mandates that the portion of the Fund in this case attributable to the contributions of the employers still in business and making contributions be used only for the benefit of their employees and not for the benefit of persons whose former employer is not making contributions to the Pension Fund. We have concluded that defendants' contention sweeps far too broadly and fundamentally mistakes Congress' purpose in enacting § 302 of the Act.

Cases cited by defendants establish no more than that a person who had never been an employee of an employer who either now or ever had contributed to the Fund cannot be a beneficiary of that trust fund merely by reason of being employed in an industry in which some employers make contributions to the trust fund or by reason of membership in a union which is party to a trust fund agreement. Thus, in Rittenbury v. Lewis, 238 F.Supp. 506 (E.D.Tenn. 1965) the court held that a person who had not been employed at any time prior to his retirement by an employer who was a signatory to the National Bituminous Coal Wage Agreement during the period of employment could not recover a pension from a § 302(c)(5) trust fund. And In the Matter of the Arbitration of the Typo-Publishers Outside Tape Fund, 344 F.Supp. 194 (S.D.N.Y.1972) the court refused to enforce an arbitrator's decision allowing trustees of a § 302(c)(5) trust fund to use the fund assets to provide benefits to union members employed by newspaper publishers who had never contributed to the fund. The court stated: "Inasmuch as the award in this case seeks . . . to use trust funds to benefit employees who are not and never have

been employees of contributing employers, implementation of the award would violate § 302(a)." *Id.* 344 F.Supp. at 196. Neither Rittenbury, Typo-Publishers nor any of the other cases cited by defendants dealt with the question before us: whether employers may lawfully make payments to a trust fund, established by an employee representative, which provides benefits to employees of employers who contributed to the Fund, during which period persons now claiming benefits were employed by the employer, but whose contributions to the fund have ceased and the value of whose contributions in the past have since been "exhausted". Resolution of this issue requires a thorough inquiry into the language of § 302(c)(5) and Congress' purpose in enacting that section. Before engaging that inquiry, however a matter must be disposed of in order to sharpen the issue before us.

 A. It is clear that defendants err in considering unlawful the payment of benefits from a § 302(c)(5) trust fund to those persons who have, at a time otherwise covered by the Pension Fund Agreement, some history of employment with currently contributing employers even though these persons were employed by a currently non-contributing employer at the time that employer ceased contributing to the Fund. Thus, a person who fulfills the contract requirements for the payment of benefits can lawfully be the beneficiary of a § 302(c)(5) trust so long as he was, during any period of time otherwise covered by the trust agreement, an employee of a currently contributing employer. All we are saying in this regard is that the notion of an employee, as that term is used within the meaning of the phrase "for the sole and exclusive benefit of the employees of such employer," need not be given the restrictive meaning urged by the defendants. There is nothing in either the language or legislative history of § 302 to indicate that Congress limited the term to a person who was employed by a currently contributing employer at a time he achieved his right

to pension benefits under an otherwise valid § 302(c)(5) trust fund agreement. Thus, benefits can be paid from a § 302(c)(5) fund to a person who is considered an employee of a currently contributing employer even as the term employee is defined in the trust fund before us in this case—"Employee" shall mean a person who is in the employ of one of the Employers on the effective date or *at any time thereafter and* who shall have been included on the effective date or *any time thereafter* in the collective bargaining unit represented by the Union. (emphasis added)

 This result is compelled by the decision in Roark v. Boyle, 141 U.S.App. D.C. 390, 439 F.2d 497 (1970). *Roark* involved a challenge to the "signatory last employment" eligibility requirement of the United Mine Workers of America Welfare and Retirement Fund Agreement of 1950. The "signatory last employment" eligibility requirement mandated that a pensioner's last employment in the coal industry must have been for an employer who has made the contributions prescribed by the agreement to the Fund. As construed by the Trustees of the UMW Welfare and Retirement Fund, pension benefits were denied to any employee working in the coal industry who was not employed for one (1) year prior to retirement with a contributing employer to the Fund even though the pensioner may have been employed by a contributing employer during a period embracing the entire time before his last year of employment in the coal industry. As justification for this requirement, the Trustees argued that employment with a contributing employer immediately before retirement was necessary to insure the lawfulness of the fund under § 302(c)(5). In rejecting this rationale for the requirement the court stated:

"We also agree that the Taft-Hartley Act requires that each pensioner have some history of contributory employment. Section 302 of that Act, 29 U.S.C. § 186, originated as an anti-bribery statute designed to restrict

payments by employers to unions and union officials. Exemptions are provided, including an exemption, set forth in paragraph (c)(5), for payments to trust funds, administered by representatives of employers and employees and neutral persons, established for the benefit of the employees, and providing e. g. for 'pensions on retirement or death of employees.' Congress obviously contemplated payments to union welfare funds would be made by employers for the benefit of their employees, in the expectation that such payments further legitimate interests of the employers. If an individual employer establishes an individual plan for the 'benefit of the employees of such employer' his legitimate interest may well lie in confining retirement benefits to his employees. The same principle applies when a group of employers pool their plans and funds. The group of employers who contribute to the Fund in the instant litigation would have no interest in payment of benefits to persons who at no time had been employed by one of the employers in the group.

\* \* \* \* \* \*

As noted above, the purpose of § 302 would be more fully carried out by the use of eligibility requirements geared to the applicant's entire contribution histories."

(footnote omitted) *Id.* 439 F.2d at 501–503. It is clear then that § 302(c)(5) does not require that an employee be employed by a currently contributing employer at the time he applies for pension benefits, otherwise earned under the pension fund agreement, in order to receive pension benefits. Under § 302 (c)(5) an employee need only have some history of contributory employment. Whether that history of contributory employment must include some employment with an employer who continues to contribute to the Fund is a matter we discuss later.

█ We wish to emphasize, however, that nothing we have stated prevents the trustees of a § 302(c)(5) trust fund from conditioning the payment of pensions on employment at the time pension benefits were otherwise earned under the Pension Fund Agreement with a currently contributing employer. We only hold that the continued lawfulness of a § 302(c)(5) trust fund does not mandate such a requirement. As stated by the court in *Roark:*

"[E]xisting law permitted the establishment and continuance of pension plans that did not provide for vesting, and conditioned eligibility on employment with a contributing employer at the time of retirement. We share this view. The purpose of § 302, to obviate possibilities of bribery yet permit open employer-employee agreements for pension plans, is furthered when the union welfare plan to which the employer contributes is the kind of plan for the benefit of employees which the employer might himself have established in his own economic interest.

Indeed the object of rewarding employer loyalty which underlies the non-vested pension has an obvious importance in the context of a pension fund, like that of the United Mine Workers, whose revenue is tied to the revenues of the participating employers. Employers signatory to the National Coal Wage Agreement pay into the United Mine Workers Welfare and Retirement Fund forty cents per ton of coal produced. Thus the amount available for pensions depends in part on keeping contributing employers competitive with non-participating employers who do not bear a pension contribution to the Fund as a cost of production. The last employment requirement does have a meaningful bearing on the survival of the participating employer since it prevents non-contributing employers who made no pension contribution from getting the benefit of miners who may have persisted in the industry and acquired experience in reliance on the retirement pensions. A trained and reasonably contented

labor supply is an asset to an employer, secured in part at least through the cost of appropriate pension plans, and there is no reason why the contributing employer should be required to make this asset available to non-contributing employees [sic] who incur no part of the cost."

(footnotes omitted) *Id.* 439 F.2d at 505–06.

B. Having delineated the scope of the term employee for whose benefit payments may be made from a § 302(c)(5) trust fund to which employers currently make contributions, we now consider whether employers may lawfully make contributions to a trust fund which provides benefits to persons who obtained their contractual right to pension benefits while employed by a currently non-contributing employer and who have no history of employment with any currently contributing employer. A literal reading of § 302(c)(5) which emphasizes the necessity that benefits be used for the sole and exclusive benefit of employees while such employees' employer is currently *"making* similar payments" to the fund would condition the legality of the fund on cessation of benefits to employees of currently non-contributing employers. Benefits to an employee of a currently non-contributing employer would under this reading of the section constitute a trust not established solely for employees of currently contributing employers. Presumably even the defendants, however, would not argue that employer payments would be illegal if made to a trust fund providing benefits to employees who have a history of employment only with a currently non-contributing employer. For it is the defendant's contention that the legality of a § 302(c)(5) trust fund depends not on the continued payments by a retiree's employer but on the economic value of the contributions made in the past to the fund by such employer.

We believe the defendants are correct in conceding that § 302 does not mandate that benefits cease to be made from a § 302(c)(5) trust fund to a person who was the employee only of an employer who stops contributing to the fund solely because the employer has discontinued making payments. Certainly § 302 *permits* the Pension Committee to continue payments to employees of employers who have ceased making contributions to the Fund to the extent of any value of the employer's contributions which remain after the termination of contributions by that employer. To allow all benefits from the fund, whether lump sum or in the form of an annuity, to cease upon the termination of payments to the Fund by the retiree's employer would undoubtedly result in payments being made by an employer to the exclusion of all his own employees covered by the Agreement. And this result is clearly unlawful under § 302. As stated by Judge (now Circuit Judge) Van Dusen in Raymond v. Hoffman, 284 F.Supp. 596 (E.D.Pa.1966):

"The defendants have suggested that § 302(c)(5) exists to allow multi-employer pension plans to use so-called 'pooled funds'. A pooled fund is simply one large fund contributed to by a number of employers, instead of many smaller funds each contributed to by only one employer. For simplicity of administration and reduction of overall expense, Congress, it seems, allowed employers, by that portion of 302(c)(5) in parentheses, to use pooled funds. But surely it is clear that employers contributing to any pension fund are doing so only for the benefit of their own employees. The fact that the fund benefits as a whole by the commingling of all employer contributions does not overcome the presumption that employers are acting, to an overwhelming extent, in the interests of only their own respective employees when contributing to pooled pension funds.

The defendants' argument goes astray when it assumes that since Congress allowed pooled funds, it also allowed employer contributions to be used to the exclusion of their own employees.

Such an assumption on the part of the defendants is inconsistent with what appears to be the purpose of § 302."

(footnotes omitted) *Id.* 284 F.Supp. at 601. Thus, it is clear that the continued payment of benefits from a § 302(c)(5) trust fund to employees who have a history of contributory employment only with an employer who ceases to contribute does not make the fund an unlawful fund to which employers may not contribute. This result is not contrary to Congress' use of the present tense in the phrase "jointly with the employees of other employers *making* similar payments . . . " (emphasis added). All this phrase requires is that an employee claiming benefits from a § 302 (c)(5) trust fund have obtained the contractual right to those benefits at the time his employer contributed to the Fund.

C. The question then remains whether Congress conditioned the continued legality of a § 302(c)(5) trust fund upon the value of payments made in the past by an employer who ceases to contribute to the Fund. A literal reading of § 302(c)(5) emphasizing the limitation that the benefit be for the use of the "employees of such employer" would require that each employee's benefit be "traced" to the value of the payments by that employee's employer. We think this reading of § 302(c)(5) is not warranted. As noted in Kreindler v. Clarise Sportswear Co., Inc., 184 F.Supp. 182 (S.D.N.Y.1960): "The Funds are not set up employer by employer with the amounts contributed by each employer set apart for the benefit of his employees. They are of a type contemplated by [§ 302(c)(5)] . . . . " In view of the presence of § 11 in the Fund Agreement before us in this case, an argument could perhaps be made that the Fund Agreement contemplates a fund set up "employer by employer with the amounts contributed by each employer set apart for the benefit of his employees." But as the *Kreindler* case indicates this is not the only type of multi-

employer pension fund permitted by § 302(c)(5).

Congress contemplated that the "employees of such employer" limitation serve the purpose, in a multi-employer established trust fund, of insuring that employer payments to the Fund benefit only those persons who, at the time contributions were made, were employees of an employer contributing to the Fund. An employee who earned his contractual right to pension benefits while employed by an employer who contributed to the Fund is within the class of persons who is an employee of an employer contributing to the Fund. Congress was not concerned with the possible risks of "unfunded liabilities" incurred by an employer who contributed to a multi-employer established trust fund. Nor was it concerned with how the payments contributed to a multi-employer fund were administered among the employees of employers contributing so long as payments made by any particular employer were not used to the exclusion of such employer's employees. We, therefore, disagree with the *Raymond* court to the extent that that court expresses the notion that Congress allowed "polled" funds to be established solely "[f]or simplicity of administration and reduction of overall expense." Raymond v. Hoffman, 284 F.Supp. at 601. Whatever the economic advantages or disadvantages of a "pooled" trust fund may be, we cannot say that Congress considered these factors in conditioning the lawfulness of payments made by an employer to a trust fund established by the employee representative of such employer for the purpose of providing pensions for employees of contributing employers. Our conclusion is in no way at odds, however, with the *Raymond* court formulation that employer payments cannot be used to the exclusion of the employer's employees. There is no evidence in this case that employees of currently contributing employers are not receiving benefits from the trust fund.

▅▅▅▅ Nor is anything we have stated contrary to the discussion of the

legislative history of § 302 in Bey v. Muldoon, 223 F.Supp. 489 (E.D.Pa.1963) aff'd per curiam, 354 F.2d 1005 (3 Cir.), cert. denied, 384 U.S. 987, 86 S.Ct. 1888, 16 L.Ed.2d 1004 (1966). In *Bey* the court stated:

> "Furthermore, a less than literal interpretation of § 302 does no violence to Congressional aims and frustrates no Congressional policy. A reading of the legislative history of § 302 compels the conclusion that the restriction of 'employees of such employer' was inserted in the Act to serve a limited function. Congress' attention had been focused upon the situation in which a union attempted to extract from an employer a promise to make payments to a union that represented employes of one or perhaps more than one employer. Congress considered these payments as substitutes for wages or salaries normally paid directly to the worker. 93 Cong. Rec. 4746(2–3) and 4747(1). I Legislative History of the Labor-Management Relations Act 1947, 458. Theoretically, an employer is willing to pay a certain amount of money for a given unit of work. If an employer agreed to give five cents to a union trust fund for every hour of work by an employe, the hourly wage paid directly to the employe would be five cents less. It is only just, said Congress, that the employe whose hour's work required the employer to make a payment of five cents to the trust fund be assured of reaping the benefit of that payment. See Senator Ball, II Legislative History of the Labor-Management Relations Act, 1322 and 1498.
>
> Congress did not want the union to use these funds for non-union or even general union purposes. 92 Cong.Rec. 5181(1) and 5345(1–2). Nor, presumably, did it want a union representing employes of more than one employer to use the funds provided by only one employer for the benefit of all the employes represented by the union without regard to which of the union

members had earned the right to this payment. These are the evils that Congress sought to avert and no others have been advanced in explanation of the provision in question."

(footnote omitted) *Id.* 223 F.Supp. at 495–496. This discussion of the legislative history establishes Congress' concern that payments by an employer to a union representing employees some of whom are covered by a pension fund agreement and other employees who are not so covered be used only for the benefit of the employees covered by the Agreement. Section 302(c)(5) does not require that an employer's contribution be set aside only for his employees when the employer payments are made to a multi-employer trust fund. The advantages of a "pooled" trust fund do not accrue to any particular employer, but rather are beneficial to all the employers contributing. This is clear from *Roark*:

> "Other concepts have been infused into pension plans as these have become demanded by employees, and made the subject of bargaining by their union representatives. Increasingly the employer's pension contribution is seen as quasi-salary, a portion of income which the employee, acting through his union, chooses to have deferred so as to provide for or supplement retirement income. Such pension plans may go so far as to give, to a greater or less degree depending on the specific terms of the plan, a vested right to the pension credits accumulated during a period of employment with a contributing employer. Employers participating in a pension plan of this type obtain the cooperation of their current employees by contributing to their pensions even though at retirement age the employee may have gone to work for another. A vested pension plan has the feature of portability, that is, the employee carries his pension credits from one job to another. In the broadest sense it promotes mobility of labor to areas and operations of greatest demand."

*Id.* 439 F.2d at 504–505. Nothing in the legislative history of § 302 illustrates an interest by Congress in restricting the broader legitimate interests involved in a multi-employer trust fund covering employees in an entire industry. Defendants' reading of § 302 would eliminate an employee acquiring a "vested" interest in a pension trust fund as a result of years of work with a contributing employer. Defendants would make an employee's interest in the fund depend on that employee's employer continuing to support the value of the employee's pension. No such purpose can be concluded from the legislative history of § 302.

The purposes for enactment of § 302 have been stated in Arroyo v. United States, 359 U.S. 419, 425–426, 79 S.Ct. 864, 868, 3 L.Ed.2d 915 (1959):

"The provision [§ 302] was enacted as part of a comprehensive revision of federal labor policy in the light of experience acquired during the years following passage of the Wagner Act * * * and was aimed at practices which Congress considered inimical to the integrity of the collective bargaining process. * * * Those members of Congress who supported the amendment were concerned with corruption of collective bargaining through bribery of employee representatives by employers, with extortion by employee representatives, and with the possible abuse by union officers of the power which they might achieve if welfare funds were left to their sole control. * * *

"Congress believed that if welfare funds were established which did not define with specificity the benefits payable thereunder, a substantial danger existed that such funds might be employed to perpetuate control of union officers, for political purposes, or even for personal gain. * * * To remove these dangers, specific standards were established to assure that welfare funds would be established only for purposes which Congress considered proper and expended only for the purposes for which they were established." [footnotes omitted]

*See also* Blassie v. Kroger Co., 345 F.2d 58 (8 Cir. 1965); United States v. Roth, 333 F.2d 450, 453 (2 Cir. 1964), petition for certiorari denied, 380 U.S. 942, 85 S.Ct. 1020, 13 L.Ed.2d 961; Sanders v. Birthright, 172 F.Supp. 895, 901 (S.D. Ind.1959); United States v. Brennan, 134 F.Supp. 42, 47 (D.Minn.1955). In concluding that § 302 allows employers to continue to make payments to a fund which provides benefits to employees of employers who earned their contractual right to pension benefits while employed by a contributing employer, we do not believe that we are approving practices Congress sought to prohibit. To the extent that the fund must satisfy the contractual liability arising out of payment of a pension to a person who worked solely for a currently non-contributing employer the value of whose contributions are now "exhausted", the fund has an unfunded liability. It does not appear that § 302 sought to prohibit the pressing by an employee representative of the employee's interest in having a fund fully funded even though the fund had not originally been established to secure full funding. This is not to say that the Fund Agreement before us was intended to provide pensions to persons whose employer contributions have been "exhausted". We only state that § 302 does not prohibit the payment of benefits on these employees' behalf concomitant with securing the payment of pensions to employees of currently contributing employers.

Our conclusion is an application of the rationale employed in Blassie v. Kroger Co., 345 F.2d 58 (8 Cir. 1965). *Blassie,* in an exhaustive opinion written by Judge (now Justice) Blackmun, held that current enjoyment of benefits of a § 302(c)(5) trust was not restricted to persons in active employment. Specially, in *Blassie,* retirees were the persons not in active employment. In finding that persons not in active employment could lawfully benefit from a § 302(c)(5) trust fund the court not only considered

Congress' clearly expressed intention to allow retirees to benefit from a § 302(c)(5) trust fund, but also the court looked to the purpose of the statute and the evils sought to be prevented. And the court concluded:

"[A] person for whom employer contributions are made prior to retirement is not barred from receiving benefits of the Trust after retirement, and that this qualification is not nullified by additional contributions made by him or by others on his behalf. We also conclude, however, that a person for whom employer contributions are not made prior to retirement is not entitled under the statute to benefits of the Trust after retirement, and that this disqualification is not cured by contributions made by him or by others on his behalf. * * * The standards . . . are met when benefits are restricted to persons who are or who have been covered active employees. This is the employee group constituting the 'sole' beneficiaries.

We do not regard our conclusion as at all violative of any call by Arroyo for literal construction of the statute. All we do in this civil proceeding is to construe the term 'employees' to mean covered current employees and persons who were covered current employees but are now retired."

*Id.* 345 F.2d at 68, 70. Although *Blassie* did not involve pension benefits to employees of employers contributing to a pension trust fund, Moglia v. Geoghegan, 403 F.2d 110, 115 n. 2 (2 Cir. 1968), we fail to see why employees for whom payments were made by contributing employers at the time the employee earned his contractual right to a pension should not be permitted to obtain the benefits of a § 302(c)(5) pension trust fund while they are permitted to enjoy the benefits of a § 302(c)(5) welfare or health trust fund. As stated by *Blassie*:

"The requirement of § 302(c)(5)(C) that payments intended for pensions or annuities flow into a separate trust administered exclusively for that purpose contains no contrary implication apparent to us. The requirement of separateness, and, for that matter, the requirement of exclusiveness of benefit for employees tie in, not unexpectedly, with those provisions of the Internal Revenue Codes exempting qualified pension and welfare trusts from income taxation."

Sections 165(a) and 101(16) of the 1939 Code; §§ 501(a), 401(a) [but see § 401(h), added in 1962 by Pub.L. 87–863, § 2(a), 76 Stat. 1141], and 501(c)(9) of the 1954 Code; 92 Cong.Rec. 5277, 5338, 5346, 5494 (remarks of Senators Ball and Taft).

*Id.* 345 F.2d at 69. We also realize that *Blassie* did not explicitly concern the question of continued payment of benefits to an employee whose employer's contributions have been "exhausted". It is clear, however, that *Blassie* did not consider the qualifications of being a beneficiary of the welfare trust fund involved in that case conditioned in any way upon the value of payments made by the employer's contributions. The person claiming the right to benefits under the trust fund needed only have earned that contractual right while within the employ of a contributing employer. There is, therefore, no reason precluding use of the *Blassie* rationale to the case before us.

### V

Although we have found that § 302 does not make illegal payments from the fund to pensioners of currently non-contributing employers, we cannot reach the question whether the Pension Fund Agreement prohibits these payments without first considering the effect of the arbitration clause in the Agreement and the mandate of arbitrability contained in § 302 of the Act. Section 302 of the Act requires as a condition of legality for a § 302(c)(5) trust fund that the Trust Fund Agreement provide for the appointment of an umpire by a U.S. District Court upon the petition of either party if the parties cannot agree to an impartial umpire themselves and if there

are no neutral persons acting as trustees to resolve a dispute over which the parties have deadlocked. This provision in the Agreement becomes operative whenever the "employer and employee groups deadlock on the administration of such fund. . . ." Section 9.3 of the Pension Fund Agreement provides for arbitration of "all questions arising in connection with the interpretation, application or administration of this Agreement." Apparently then the arbitration clause in the Agreement is broader than that required by § 302(c)(5). We need not decide, however, whether the Act requires arbitration of the issue concerning § 11 since it is clear that these issues must be arbitrated under the Agreement.

The parties in the case before us are not parties to the Pension Fund Agreement; they cannot mutually modify the Agreement. In addition, Federal labor policy favors arbitration. Steelworkers Trilogy, 363 U.S. 564, 574 and 593, 80 S.Ct. 1343, 1347, 1358, 4 L.Ed.2d 1403, 1409, 1424 (1960). The issues concerning § 11 involve interpretation of the Agreement, and therefore under the Agreement are subject to arbitration by the parties. Thus, pursuant to the Agreement the parties must arbitrate these issues.

## ORDER

Now, March 26, 1973, it is ordered:

1. Plaintiffs' motion for a permanent injunction is denied.

2. Defendants' motion for a permanent injunction is denied.

3. Since the issues in dispute between the parties involve "questions arising in connection with the interpretation, application or administration" of the Pension Agreement, the parties forthwith shall submit to arbitration pursuant to Section 9.3 of the Pension Agreement the following issue [as well as any others as counsel may agree:

[(a)] "What meaning shall be given to Section 11 of the Pension Agreement within the framework of the controversy between the parties as set forth herein."

(b) Assuming Section 11 has the meaning which defendants contend, are defendants estopped from so interpreting Section 11.

(c) Is the interpretation accorded Section 11 by defendants unreasonable and thus invalid.

4. This Court shall retain jurisdiction.