TANZILLO, Andrew

v.

**LOCAL UNION 617, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA,** Trucking Employees of North Jersey Pension Fund, Local 617 (an unincorporated trust), and Board of Trustees of Trucking Employees of North Jersey Pension Fund, Local 617 and Marvin Zalk, Fund Administrator.

Appeal of Andrew TANZILLO.

No. 84–5325.

United States Court of Appeals, Third Circuit.

Argued Dec. 11, 1984.

Decided July 29, 1985.

As Amended Aug. 14, 1985.

Herbert New (argued), Herbert New, P.C., Clifton, N.J., for appellee, Trucking Employees.

Paul A. Friedman (argued), Schneider, Cohen and Solomon, Jersey City, N.J., for appellee, Local 617.

Before GARTH, and HIGGINBOTHAM, Circuit Judges and McGLYNN, District Judge.*

## OPINION OF THE COURT

GARTH, Circuit Judge:

Andrew Tanzillo sought to receive full pension benefits from the Trucking Employees of North Jersey Pension Fund (the Fund). The Fund, after initially acknowledging Tanzillo's eligibility, rejected his claim, based on the fact that Tanzillo's former employer, Arrow Transportation, did not participate in the pension fund. Tanzillo's internal appeal to the Fund was unsuccessful. He then brought an action against Local 617[1] and the Fund.

The district court granted summary judgment for Local 617 and the Fund, finding that Tanzillo's receipt of a Local 282 pension barred his claim under the pro-rata pension provision of the Fund's plan.

While we disagree with the district court's reliance on Tanzillo's receipt of the Local 282 pension as the basis for disqualifying Tanzillo under the pro-rata provision of the Fund's plan, we nevertheless affirm the grant of summary judgment.[2]

Michael T. Scaraggi (argued), Oransky, Scaraggi & Borg, East Orange, N.J., for appellant.

---

* Honorable Joseph McGlynn, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

1. Tanzillo's action also complained of the failure of Local 617 and the Fund to provide copies of relevant collective bargaining agreements when requested. See text infra, pp. 145 et seq.

2. The district court relied on the pro-rata provision of the Fund's plan which required for eligibility that:

   (4)(a) An Employee shall be eligible for a Pro-Rata Pension under this plan if he meets all of the following requirements:

   \* \* \* \* \* \*

   (iv) A pension is not payable to him [the employee] from a Related Pension Plan independently of the provisions for Pro Rata Pensions (or its equivalent provision, regardless of name). An Employee who is otherwise eligible for such a non Pro Rata Pension may fulfill this requirement by electing not to apply for, or by waiving such other pension.

   Since Tanzillo concededly receives a partial pension from the Local 282 fund, the district court found him ineligible for the Local 617 pension. However, this finding ignores the last sentence of the pro-rata provision, which allows such an employee to waive the partial pension.

   We can affirm even though we rely on a different ground than that relied on by the district court. *PAAC v. Rizzo,* 502 F.2d 306, 308 n. 1 (3d Cir.1974), cert. denied 419 U.S. 1108, 95 S.Ct. 780, 42 L.Ed.2d 804 (1975).

We hold that even though the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 et seq. applies to Tanzillo's claim, Tanzillo has failed to establish his eligibility under the Fund's plan.

## I.

The facts stipulated by the parties in the pretrial order are as follows: In 1951, Tanzillo commenced his employment with Arrow Transportation (now defunct), and joined Local 617. In 1967 Tanzillo left Arrow and commenced employment with Sexton Foods. At that time he became a member of Local 282. Arrow was required by its collective bargaining agreement with Local 617 to make contributions to the Pension Fund only for the period September 1, 1956 to August 31, 1958. In fact no such contributions were ever made.[3] Sexton Foods participated in a separate pension plan, which was recognized by the Local 617 Pension Fund for reciprocity purposes. Sexton Foods was never required to make contributions to the (Local 617) Fund.

In early 1979, in response to an inquiry by Tanzillo, the Fund informed Tanzillo that he had a total of 50 quarters of accrued pension credits by reason of his employment with Arrow, and an additional 41 quarters of reciprocal credits by reason of his employment with Sexton. On February 25, 1981, Tanzillo received a second letter from the Fund which indicated that the 50 quarters of pension credits previously attributed to Tanzillo had been erroneously credited. The letter, which was addressed to Local 282 with a copy to Tanzillo, read:

Kindly be advised that in reviewing Mr. Tanzillo's pension application. [sic] We find that the Company, Arrow Transportation, only contributed into the Welfare Fund, they did not contribute into the Pension Fund, therefore, we will not participate in a pro-rata pension.

During discovery, it emerged that contrary to the Fund's original understanding, Tanzillo's former employer, Arrow Transportation was required to make pension plan contributions (though none were actually made) for two years of Tanzillo's 16 years of employment.

For Tanzillo to be entitled to a full pension under the Fund's plan, he would require a total of 60 eligible quarters of credit. Tanzillo claims that he accrued twelve quarters of Arrow pension credits during the period September 1956 through August 1958, plus an additional seven quarters of "prior service" credit with Arrow, or a total of 19 quarters of pension credit. These 19 quarters of credit, if combined under the Fund's "pro rata pension" provision[4] with the 41 quarters earned during employment with Sexton Foods, would yield the 60 quarters of credit which Tanzillo requires for a full pension, provided all of the credits count toward Tanzillo's pension.

The Fund does not deny that Tanzillo had accrued 19 quarters of pension credit with the Fund as a result of his service with Arrow. However, the Fund contends that Tanzillo lost the benefit of these credits because he suffered a "break in service" as that term is defined in the 1962 Plan applicable during Tanzillo's actual service with Arrow.

Tanzillo counters that the 1978 Plan, and not the 1962 Plan, should apply to him. He claims that the 1978 Plan, which was the plan in effect on the date he ceased employment with Sexton Foods and filed his claim with the Fund should control his pension claim. Under the 1978 Plan, Tanzillo asserts that he would not forfeit his credits because of a "break in service." Alternatively, Tanzillo contends that ERISA applies to his claim and that the provisions of

3. Arrow was required, and did in fact, make contributions to a *welfare* fund also administered by Trucking Employees of North Jersey during Tanzillo's entire period of employment.

4. The relevant text of the pro-rata pension provision of the 1978 Plan is attached to this opinion

as Appendix A. It appears that since Tanzillo had insufficient Local 617 credits for a full pension, the only way he could qualify for a full pension would be to combine his Local 617 and Local 282 credits under the pro-rata provision.

ERISA bar forfeiture of his 19 quarters of Arrow pension credits under the facts of this case.

## II.

Initially, we must decide whether the district court lacked subject matter jurisdiction over Tanzillo's claim.

The briefs submitted by the parties did not address the issue of subject matter jurisdiction, apparently assuming that jurisdiction was provided by ERISA. The Fund's argument focused on whether the substantive provisions of ERISA applied to Tanzillo's pension claim because although Tanzillo had earned pension credits prior to the effective date of ERISA (January 1, 1975), Tanzillo's pension claim itself was not assertable until after ERISA's effective date. Section 502 of ERISA, 29 U.S.C. § 1132 provides in relevant part:

§ 1132.  Civil enforcement

Persons empowered to bring civil action

(a) A civil action may be brought—

(1) by a participant or beneficiary—

\*     \*     \*     \*     \*     \*

(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

\*     \*     \*     \*     \*     \*

(e)(1) .... State courts of competent jurisdiction and district courts of the United States shall have concurrent jurisdiction of actions under subsection (a)(1)(B) of this section.

\*     \*     \*     \*     \*     \*

(f) The district courts of the United States shall have jurisdiction, without respect to the amount in controversy or the citizenship of the parties, to grant the relief provided for in subsection (a) of this section in any action.

The broad language of section 502 would appear to grant to the district courts subject matter jurisdiction over a suit by a plan beneficiary, such as Tanzillo, to recover benefits claimed to be due to him. Nevertheless, in a factual situation strikingly similar to the one before us, involving break-in-service rules, the Ninth Circuit has recently held that the district court lacked subject matter jurisdiction. *Menhorn v. Firestone Tire & Rubber Co.*, 738 F.2d 1496 (9th Cir.1984).

In *Menhorn*, the claimant temporarily severed his employment with Firestone's Los Angeles plant in 1967. Prior to his resignation, Menhorn was advised by Firestone that, should he return to Firestone in Los Angeles, he would not receive the benefit of his prior pension credits, by reason of the then applicable break-in-service rules. Menhorn returned to employment with Firestone in Los Angeles, where he worked until he was laid off in 1980. In 1980, Firestone denied his pension claim, again relying on the 1967 break-in-service provision.

In vacating the district court's judgment, the Ninth Circuit found ERISA's broad grant of jurisdiction to be limited by the effective date of ERISA section 514, 29 U.S.C. § 1144. Section 514 excepts from federal pre-emption, state laws applicable prior to ERISA's effective date:

(b)(1) This section shall not apply with respect to any cause of action which arose, or any *act or omission* which occurred, before January 1, 1975.

(emphasis added)

While conceding that Menhorn's claim arose when benefits were denied in 1980 (after ERISA's effective date), the Ninth Circuit held that the relevant "act or omission" for ERISA purposes was the 1967 effect of the break-in-service rule, from which a denial of benefits inexorably would follow. Thus, the substantive provisions of ERISA were found to be inapplicable to Menhorn's claim. Reasoning that Congress could not have meant to give federal courts jurisdiction over claims to which federal law would not apply, the Ninth Circuit held that under the "act or omission" test, the federal courts lacked jurisdiction.

We need not address the question whether ERISA's jurisdictional grant is limited

by section 1144's pre-emption clause, since we decline to accept the Ninth Circuit's underlying finding that the metaphysical operation of the 1967 break-in-service clause is the relevant "act or omission" for the purposes of the ERISA fiduciary standards.[5] This Court has recognized that the grant or denial of pension benefits by fund trustees, not only gives rise to the beneficiary's cause of action (as indeed *Menhorn* also holds) but we have also recognized that the grant or denial of pension benefits is itself the "act or omission" subject to ERISA's fiduciary standards. See *Wolf v. National Shopmen Pension Fund,* 728 F.2d 182 (3d Cir.1984); *Rosen v. Hotel and Restaurant Employees & Bartenders Union,* 637 F.2d 592, 596 n. 5 (3d Cir.1981). See also *Struble v. New Jersey Brewery Employees Welfare Trust Fund,* 732 F.2d 325, 332 (3d Cir.1984) (ERISA fiduciary standards apply to post-ERISA misapplication of funds even though contributions were made pre-ERISA). Thus, we are in accord with *Menhorn* to the extent that *Menhorn* acknowledges that the cause of action arises when a pension is denied. We part company with the Ninth Circuit, however, in its failure to recognize a pension denial as the "act or omission" which is subject to ERISA.

■ In this respect, we believe the reasoning of Judge Ferguson in his *Menhorn* dissent more fully comports with the law of this Circuit. While the determination of a claim upon the Fund may require the Fund trustees to consider events that have taken place before ERISA's enactment, the act of granting or denying a pension nevertheless involves a contemporaneous construction of the plan's provisions—an "act or omission" to which ERISA's fiduciary standards apply, and, by extension, over which the district courts are unquestionably given juris-

diction. See *Menhorn,* 738 F.2d at 1508 (Ferguson, J., dissenting). For this reason, we hold that Tanzillo's claim based on a 1981 denial of pension benefits, is properly within the subject matter jurisdiction of the federal courts under 29 U.S.C. § 1132 even though events prior in time to January 1, 1975 governed Tanzillo's eligibility. We note that the identical conclusion was reached by another panel of this Circuit in *Jameson v. Bethlehem Steel Corporation,* 765 F.2d 49, (3d Cir.1985). *Jameson* holds that ERISA jurisdiction extends to claims based upon events occurring long before ERISA's effective date, so long as the cause of action arises after ERISA's effective date.

### III.

We have found subject matter jurisdiction under ERISA because we have held that the "act or omission" giving rise to Tanzillo's action was the post-ERISA denial of his pension by the Fund in 1981. In so concluding however, we have determined only that ERISA applies to Tanzillo's action despite the fact that Tanzillo's employment by Arrow predated ERISA's effective date. In making that determination we have not foretold the ultimate result of Tanzillo's claim nor have we decided which of ERISA's substantive provisions applies to his claim—a claim based on Tanzillo's employment before January 1, 1975, but filed and denied after that date. We turn now to an examination of ERISA's provisions in order to make those determinations.

Tanzillo asserts that under ERISA, all of his years of service with Arrow (1951 to 1967) must be counted towards vesting. Tanzillo relies on a statement in the Labor Regulations covering employees moving from contiguous covered service (as Tanzil-

---

**5.** *Menhorn v. Firestone Tire & Rubber Co.,* 738 F.2d 1496 (9th Cir.1984) is also distinguishable from this case in two respects. First, unlike Menhorn, Tanzillo received no contemporaneous interpretation by the Fund trustees that he was incurring a break in service when Arrow ceased to participate in the pension plan. Thus, the first interpretation of the Plan as applied to Tanzillo occurred when his benefits were de-

nied, *after* the effective date of ERISA. Second, Tanzillo challenges the trustees' current interpretation of the Plan. Cf. *Menhorn,* 738 F.2d at 1502 (challenged action "involved no exercise of discretion or interpretation of the plan.") For the reasons discussed in text, however, we prefer to disavow *Menhorn* rather than to rely on its distinguishing characteristics.

lo's 1956 through 1958 service with Arrow was) to non-covered service (as all of Tanzillo's service with Arrow after 1958 was, since Arrow was not participating in the Fund after 1958). According to the provision cited,

> If an employee moves from contiguous noncovered to covered service, or from covered service to noncovered service, with the same employer, the plan is required to credit all hours of service with such employer for purposes of eligibility to participate and vesting.

29 C.F.R. § 2530.210(c)(1).

Read literally and in isolation, this regulation would require vesting credit for all of Tanzillo's service with Arrow. This reading, however, ignores subsection (a) of the regulation, which explicitly makes this vesting rule subject to the "break-in-service" exception "provided in section[ ] ... 203(b)(1) of [ERISA]." [6] ERISA section 203(b)(1), 29 U.S.C. § 1053(b)(1), provides that:

> (b)(1) In computing the period of service under the plan for purposes of determining the nonforfeitable percentage under subsection (a)(2) of this section, all of an employee's years of service with the employer or employers maintaining the plan shall be taken into account, except that the following may be disregarded:
>
> \*     \*     \*     \*     \*     \*
>
> (F) years of service before this part first applies to the plan if such service would have been disregarded under the rules of the plan with regard to breaks in service, as in effect on the applicable date.

**6.** In pertinent part, the regulation, provides:

> (a) *General statutory provisions—(1) Eligibility to participate and vesting. Except as otherwise provided in* sections 202(b) or *203(b)(1)* of the Act and section 410(a)(5), 411(a)(5) and 411(a)(6) of the Code, all years of service with the employer or employers maintaining the plan shall be taken into account for purposes of section 202 of the Act and section 410 of the Code (relating to minimum eligibility standards) and section 203 of the Act and section 411(a) of the Code (relating to minimum vesting standards).

29 C.F.R. § 2530.210(a)(1) (emphasis added). Additionally, the regulation cited by Tanzillo

ERISA thus explicitly recognizes break-in-service forfeiture of those credits which had been accrued prior to the effective date of ERISA, if such break-in-service forfeiture is provided for in the applicable plan document. In Tanzillo's case, the applicable plan document must be either the 1962 plan applicable during his employ with Arrow, or the 1978 plan in effect when he made his claim. If Tanzillo incurred a break in service under the applicable plan, neither ERISA nor the regulations requires that Tanzillo be given pension credits for his service with Arrow.

### IV.

■ Tanzillo's credits for his service with Arrow survive, then, only if he had not incurred a break in service under the applicable break-in-service provisions. In general, a break in service occurs when an employee fails to earn any pension credits for a period prescribed by the applicable plan. Tanzillo concedes that Arrow was not obligated to contribute to the Fund for any year after 1958, and that he thus accrued no Local 617 pension credits after that date. But, he contends that while employed at Arrow, he had not incurred any "break in service" which would operate against his pension claim because, as he construes the 1978 plan provisions, no break in service could occur if, as was the case, his employer (Arrow) had a collective bargaining agreement with Local 617. Tanzillo claims that this result obtains even though Arrow did not participate in the Fund from 1959 to 1967, the date when Tanzillo left Arrow.[7]

and quoted in text, § 2530.210(c)(1), specifically refers to the § 2530.210(a)(1) exception.

**7.** Tanzillo relies on section 4.03 III(D) of the 1978 plan, which provides:

> III. The following will not be counted as days of service but will also not be counted toward a Break in Service.
>
> \*     \*     \*     \*     \*     \*
>
> (D) Employment during the period of such Break in Service under a collective bargaining agreement of an employer with Locals 560, 617, 641 or any other local affiliated with the Joint Councils of the International Brotherhood of Teamsters, Chauffeurs, Warehouse-

The 1978 plan provisions, however, do not apply to a break in service occurring prior to 1978. Tanzillo relies on cases that make the plan in effect at the time an employee files his claim controlling, *see Govoni v. Bricklayers Pension Fund*, 573 F.Supp. 82 (D.Mass.1983); *Snyder v. Titus*, 513 F.Supp. 926 (E.D.Va.1981).

*Govoni* held that the plan in effect at the time of the pensioner's claim governs the treatment of a break-in-service; however, *Govoni* upheld an interpretation of the 1976 break-in-service provision which made a different break-in-service rule applicable to pre-ERISA breaks in service than that applicable to post-ERISA breaks in service. The *Snyder* case applied a 1976 break in service rule to employment in the 1950's, despite a differing break in service provision in the 1959 plan. However, the *Snyder* Plan did not provide, as the 1978 Plan on which Tanzillo relies does, that the break-in-service rule to be applied is the one in effect at the time of the break in service. That provision, Section 3.22 of the 1978 Plan, explicitly provides that pension eligibility "shall be determined under the terms of the Plan ... *in effect at the time the Participant separates from covered employment.*" (emphasis added). Tanzillo's last year of *covered* employment was 1958—the last year Arrow was required to contribute to the Fund on his behalf. Tanzillo's last year of employment under Local 617's contract was 1967.

■ These circumstances make the 1962 break-in-service rules controlling under the terms of the 1978 plan. *Snyder* is thus distinguishable, since *Snyder* involved a plan document which was silent as to which break-in-service rule controlled a break in continuity in a prior year. As the *Snyder* court itself noted, nothing in ERISA prevents a plan from *"expressly* providing that a break in service in years prior to the effective date of ERISA shall be governed by the rule in effect at the time of the alleged hiatus from covered employment." *Snyder, supra*, 513 F.Supp. at 937. The *Govoni* case also allowed differential treatment of pre- and post-ERISA breaks in service. Similarly ERISA section 203(b)(1)(F) supports application of the 1962 plan provisions to a 1958 through 1967 break in service, since it expressly allows forfeiture of accrued credits for a break in service "under the rules of the plan with regard to breaks in service, as in effect on the applicable date." *Cf. Menhorn, supra*, (breaks in service prior to effective date covered by plan in effect at time of break).

Under the terms of the 1962 plan, a permanent break in service occurs as follows:

SECTION 5. *BREAKS IN SERVICE.* If there is a break in the continuity of an Employee's Pension Credits, he shall lose credit for his service prior to the break.

(a) A break in service shall be deemed to have occurred (whether before or after September 1, 1952) if an employee lacks credit for eight consecutive Pension quarters or if he has earned less than four quarters of Pension Credit within any period of twelve consecutive Pension Quarters.

■ Tanzillo only earned Local 617 credits during the time that Arrow was obligated to contribute to the Fund, i.e., for the years 1956 through 1958. Thus, by 1961, two years, or eight quarters, had elapsed during which time Tanzillo had not earned any pension credits. Because section 5(a) of the 1962 plan provides that a break in service occurs if "an employee lacks credit for eight consecutive pension quarters,"

---

men and Helpers of America, but for which contributions to the Pension Fund were not required by said collective bargaining agreement.

Since at all times during his employment with Arrow, Tanzillo worked under a Local 617 collective bargaining agreement, the periods of Arrow's non-participation come within the language of this provision. While we find the 1978

break-in-service provision inapplicable, we note that this provision appears in the section of the plan which only deals with *one year* breaks in service. The *permanent* break-in-service section of the 1978 plan has no analogous provision, and thus a *permanent* break in service may occur even while an employee is working under a Local 617 contract.

Tanzillo in 1961 incurred a break in service and forfeited all prior credits. Accordingly, although at one time Tanzillo had accrued 19 quarters of pension credits, those credits which had been accrued up to 1959 were then forfeited due to the break in service that we have just described. Hence, as of 1978, when Tanzillo applied for a pension, he had no Local 617 credits with the Fund, and thus could not, and did not, qualify for a pro-rata pension.

Our review of the Fund's determination to deny a claimant benefits under the terms of the plan requires us to defer to the trustees' determination so long as their interpretation of the plan is neither arbitrary nor capricious. *See Struble v. New Jersey Brewery Workers, supra.* Since we conclude that the 1978 plan required the break-in-service provisions of the 1962 plan to be applied to Tanzillo's claim and since we also conclude that the 1962 break-in-service rule was correctly applied to Tanzillo, requiring the forfeiture of Tanzillo's Local 617 pension credits, it is evident that the Trustee's interpretation of the Plan and the break-in-service rule is neither arbitrary nor capricious and thus must be upheld under our standard of review.

## V.

In addition to his pension claim, Tanzillo had also sought to obtain from both Local 617 and the Fund copies of all collective bargaining agreements in effect between Local 617 and Arrow Transportation for the years of his employment by Arrow. Both Local 617 and the Fund resisted Tanzillo's demand. Tanzillo was only provided with a copy of the 1962–64 agreement. He claims that under 29 U.S.C. section 414, he was entitled to receive all such agreements. Section 414 provides that:

It shall be the duty of the secretary or corresponding principal officer of each labor organization, in the case of a local labor organization, to forward a copy of each collective bargaining agreement made by such labor organization with any employer to any employee who requests such a copy and whose rights as such employee are directly affected by such agreement. . . .

29 U.S.C. § 414.

Local 617 relied upon 29 U.S.C. section 414 in denying Tanzillo the agreements which he sought. Defendant Local 617 argued that under the Act a local labor organization only has the obligation to furnish copies of such agreements to an *employee* who requests such a copy and whose rights as an employee are directly affected by the agreement. If those qualifications are met, then copies of the particular agreement must be made available for inspection by any member of the local or by an employee whose rights are affected. Pointing out that Tanzillo at the time of his request was neither an employee affected by the agreement sought, nor a member of Local 617, the defendant local refused to honor Tanzillo's request.

Membership in the labor organization sued has been held "pivotal" to an employee's suit to enforce rights under the Labor Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. § 401 et seq. *Hughes v. Local No. 11 of International Association of Bridge, Structural and Ornamental Ironworkers,* 287 F.2d 810 (3d Cir. 1961). A member of a labor organization is defined by the Act as:

"Member" or "member in good standing" when used in reference to a labor organization, includes any person who has fulfilled the requirements for membership in such organization, and who neither has voluntarily withdrawn from membership nor has been expelled or suspended from membership after appropriate proceedings consistent with lawful provisions of the constitution and bylaws of such organization.

29 U.S.C. § 402(*o*). An employee under the LMRDA is defined:

"Employee" means any individual employed by an employer, and includes any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice or because of exclusion or expulsion from a labor orga-

nization in any manner or for any reason inconsistent with the requirements of this chapter.

29 U.S.C. § 402(f).

■ Tanzillo voluntarily withdrew from membership in Local 617 when he left Arrow in 1967 and went to work for Sexton under a Local 282 contract. The fact that Local 282 and Local 617 are both parts of the International Brotherhood of Teamsters does not make Tanzillo a "member" of Local 617. The language of section 414 quite clearly recognizes the independent existence of local unions, and gives local unions responsibilities which are different from those of the national organizations. While this may have the effect of making it difficult for an ex-union member to obtain collective bargaining agreements relevant to his rights as a former employee, such is the unequivocal effect of the statutory language. Cf. *Linder v. Berge*, 739 F.2d 686, 690 (1st Cir.1984) (although appellants alleged union membership with sufficient specificity, no authority exists empowering a *former* member of a union to bring a private action for damages against a union that has failed to comply with § 414).

■ Insofar as the Fund is concerned, nothing in section 414 imposes an obligation upon a pension fund to maintain or produce copies of collective bargaining agreements.[8]

Having concluded that no statutory obligation was imposed upon Local 617 or the Fund to furnish the collective bargaining agreements sought by Tanzillo, it is evident that the district court did not err in granting summary judgment in favor of the defendants on this claim as well as on Tanzillo's pension claim.

8. The Fund also calls our attention to Tanzillo's lack of prejudice in not obtaining the collective bargaining agreements immediately after his request for them. During discovery Tanzillo was furnished the various documents that he originally sought. See brief for appellants at 3. In any event, the union furnished Tanzillo with the 1962–1964 collective bargaining agreement on

## VI.

We have determined that subject matter jurisdiction under ERISA exists; that even though ERISA applies, the break-in-service terms of the applicable plan require forfeiture of the pre-ERISA pension credits earned by Tanzillo, and that therefore the Fund's interpretation of the Plan denying Tanzillo's pension claim must be sustained as it was neither arbitrary nor capricious. Accordingly, the judgment of the district court granting summary judgment in favor of defendants Local 617 and the Trucking Employees of North Jersey Pension Fund will be affirmed. Costs will be taxed against the appellant Tanzillo.

### APPENDIX A

### RELEVANT PORTIONS OF PRO–RATA PENSION PROVISION OF THE 1978 PLAN

(1) PURPOSE. Pro-Rata Pensions are provided under this Plan for Employees who would otherwise be ineligible because their years of employment have been divided between Covered Employment and employment covered by another pension plan or whose pensions would otherwise be in less than the full amount because of such division of employment.

(2) RELATED PLANS. By resolution duly adopted, the Trustees may recognize another pension plan as a Related Plan.

(3) RELATED PENSION CREDITS. Pension (service) credits accumulated and maintained by a man under a Related Plan shall be recognized under this Plan as Related Pension Credits. The total of a man's Related Pension Credits and the pension Credits which he has accumulated and maintained directly under this Plan (referred to in

which the 1962 Plan was predicated. As noted in text, *supra*, Tanzillo argues that it is the 1978 Plan and not the 1962 Plan that applies to him. Tanzillo was not employed by Arrow at the time the 1978 Plan was drafted nor did he ever seek the collective bargaining agreement then in effect.

this Article as Local 617 Pension Credits) shall be known as his Combined Pension Credits. For purpose of this Plan, the term "Related Pension Credits" does not include service under the coverage of a plan which is not recognized by the Trustees of this Plan as a Related Plan.

(4) ELIGIBILITY.

(a) An Employee shall be eligible for a Pro Rata Pension under this Plan if he meets all of the following requirements.

(i) He would be eligible for a Regular, Deferred, Early, Service or Disability Pension under this Plan were his Combined Pension Credits treated as Local 617 Pension Credits.

(ii) He has credit for at least eight quarters of Local 617 Pension Credits based on actual employment after August 31, 1952, except that no more than two such quarters shall be required if he has credit for at least six quarters based on actual employment under the coverage of a Related Fund or Funds after August 31, 1952.

(iii) He is found entitled to a Pro Rata Pension from the Pension Fund under which he is last covered before his retirement. The Fund under which an Employee is "last covered before his retirement" shall be deemed to be the following:

(A) The Pension Fund associated with the local union of which he is a member at the time of, or immediately prior to, his retirement, or, if he is not then a member of any one such local union, then,

(B) The Pension Fund under the coverage of which he was principally employed during the period of 36 consecutive calendar months immediately preceding his retirement.

(iv) A pension is not payable to him from a Related Pension Plan independently of its provisions for Pro Rata Pensions (or its equivalent provisions, regardless of name). An Employee who is otherwise eligible for such a non Pro Rata Pension may fulfill this requirement by electing not to apply for, or by waiving such other pension.

(b) The rule with respect to breaks in service as set forth in Section 4.03 shall be applied to determine whether prior Combined Pension Credits shall be considered in determining whether a break in service has occurred.

A. LEON HIGGINBOTHAM, Jr., Circuit Judge, dissenting in part.

I join in parts I through IV and part VI of the court's opinion, but dissent from part V. I would hold that the Labor-Management Reporting and Disclosure Act (LMRDA) required Local 617 to provide Tanzillo with copies of the collective bargaining agreements in effect while he worked for Arrow, even though he was neither a Local 617 member nor an active Arrow employee when he requested them.

The facts pertinent to this issue are simple. Andrew Tanzillo worked for Arrow Transportation Company from 1951 to 1967, during which time he belonged to a bargaining unit represented by Teamster Local 617. He belonged to Local 617 as well, until transferring his union membership to Local 282, in 1968, shortly after beginning work at John Sexton Foods. When Tanzillo retired in 1979, a dispute arose as to whether, by virtue of his past employment with Arrow, he was eligible for benefits from Local 617's pension fund. During the course of the dispute, and before bringing this action, Tanzillo asked Local 617 for copies of all collective bargaining agreements between it and Arrow covering the period of his Arrow employment, 1951–1967. He received only the 9/1/62–8/31/64 contract, and now claims that Local 617's failure to provide the remaining agreements violated LMRDA, specifically 29 U.S.C. § 414. The relevant portion of § 414 compels union locals

to forward a copy of each collective bargaining agreement made by such labor organization with any employer to any employee who requests such a copy and

whose rights as such employee are directly affected by such agreement.... [1] Local 617 reads this provision to mean that Tanzillo has no § 414 rights because he was not an employee of Arrow, within the meaning of the LMRDA, when he requested the agreements. Though the majority agrees with the union, I find such a narrow reading of § 414 unwarranted by its language and violative of its purpose.

Section 414 guarantees "any employee" access to "each collective bargaining agreement" made with "any employer" so long as the requested agreement directly affects his or her rights as an employee. Nothing in this expansive language suggests that only those employment-related rights created by a union-negotiated contract with an individual's *current* employer trigger § 414. On the contrary, by its liberal use of "each" and "any" the statute recognizes that collective bargaining agreements retain vitality beyond their expiration dates and can affect the rights of those who have worked under their provisions far into the future.

This inclusive language reflects the purpose of § 414. Senator McClellan, who introduced the access requirement as an amendment to the Senate version of what became the LMRDA did so out of a belief that workers "are entitled to know the terms of the contracts under which they are working, under which they have rights, and under which their wages, working conditions, and so forth, are defined." 105 Cong.Rec. 6554 (April 23, 1959), *reprinted in 2 NLRB, Legislative History of the Labor-Management Reporting and Disclosure Act of 1959*, at 1159 (1959). This court holds a similar view of the purpose of § 414, observing in *Price v. International Brotherhood of Teamsters*, 457 F.2d 605, 610 (3d Cir.1972) that "[t]his part of the Act's 'Bill of Rights' was intended to permit employees to be able to enforce their rights under the contract by allowing them to see what benefits they were entitled to under the agreement." The crux of § 414 is simple—a person whose rights are defined by a collective bargaining agreement must know what the agreement says if those rights are to have meaning.[2]

Tanzillo is just such a person. The agreements he requested deal with Arrow's obligation to make pension fund contributions during his tenure as an Arrow employee, and thus affect his employment-related pension rights. He was an Arrow employee while those agreements were in effect, and now seeks to vindicate rights created by that employment and those agreements. To read him out of § 414 simply because he had no need to request the agreements until Local 617's pension fund disputed his eligibility for benefits renders his contract rights meaningless to him, thus violating the statute's fundamental purpose. The statutory definition of employee for LMRDA provides that:

> "Employee" means any individual employed by an employer, and includes any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice or because of exclusion or expulsion from a labor organization in any manner or for any reason inconsistent with the requirements of this chapter.

29 U.S.C. § 402(f). This definition is silent as to the timing of the employment that will give an individual "employee" status vis a vis a particular employer. If anything, its reference to strikers recognizes that one who is not currently working can

**1.** Section 414 also provides for access to collective bargaining agreements by union members. As the parties agree that Tanzillo was no longer a member of Local 617 when he made his request, this provision of the statute is irrelevant to my analysis.

**2.** *Meaningful* access to collective bargaining agreements has been recognized as a crucial right owed to workers by unions. In *Retana v.*

*Apartment, Motel, Hotel and Elevator Operators Union*, 453 F.2d 1018, 1023–24 (9th Cir.1972), the Ninth Circuit held that under duty of fair representation law, a union may have an affirmative obligation to provide non-English speaking bargaining unit members with information about their contract rights and relevant rules in their own language.

be an "employee" within the LMRDA. In other areas of labor relations law, courts confronted with similarly open-ended definitions of "employee" have looked, as I do here, to the purpose of the substantive law at issue in order to find the proper scope of the term. In the context of both duty of fair representation law and challenges to the legality of employer contributions to union-established welfare and pension funds, this approach has yielded definitions of "employee" that include individuals no longer currently working for the relevant employer.

In *Blassie v. Kroger Company*, 345 F.2d 58 (8th Cir.1965), for example, the Eighth Circuit held that consistent with a statute allowing employer contributions to pension and welfare trust funds to be made only "for the sole and exclusive benefit of the employees of such employer," 29 U.S.C. § 186(c)(5), retirees were eligible beneficiaries of trusts established during their active employment, and "employees" for purposes of the statute. 345 F.2d at 68. Interpreting the same statute, a district court in this circuit held that retirees who obtained their contractual right to pension benefits while employed by a company no longer contributing to the fund, and who had never worked for a currently contributing employer, were nevertheless "employees" within § 186(c)(5) and thus eligible for benefits under the fund. *Crawford v. Cianciulli*, 357 F.Supp. 357, 372 (E.D.Pa. 1973). In reaching their holdings and

recognizing inactive workers as employees, the *Blassie* and *Crawford* courts rejected the same literal definition of "employee" that Local 617 has advanced.

This court, too, has embraced a conception of "employee" designed to protect rights created by collective bargaining agreements. In *Nedd v. United Mine Workers*, 400 F.2d 103 (3d Cir.1968), retired coal miners sued their union for its failure to compel employers to make bargained-for royalty payments into the union's pension fund, accusing the union of favoring active miners over retired ones. Noting that the union allegedly entered into contracts undertaking to protect the rights of retired workers, Chief Judge Hastie wrote that the Union's duty as a "representative of employees to act in their interest, fairly and in good faith, and without unreasonable discrimination throughout the area in which it has been empowered to function" attached to its dealings with and on behalf of the retirees. 400 F.2d at 105. Though the duty of fair representation "arises out of the union-employee relationship," 400 F.2d at 106, and the retirees were not active workers, they were nonetheless employees for the purposes of duty of fair representation law.[3]

Labor relations jurisprudence, as well as the language and purpose of § 414, support the conclusion that Tanzillo is an "employee" to whom Local 617 should have forwarded copies of the requested collective bargaining agreements.[4] I would hold

---

**3.** In a subsequent appeal in *Nedd*, this court reaffirmed its holding in light of a challenge premised on the Supreme Court's ruling in *Allied Chemical and Alkali Workers of America Local No. 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971), that retirees are not bargaining unit members and their interests are thus not mandatory collective bargaining subjects. *See Nedd v. UMW*, 556 F.2d 190, 199–200 (3d Cir.1977), *cert. denied*, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 757 (1978).

**4.** The majority apparently seeks to avoid the entire issue of whether Tanzillo is an "employee" for the purpose of § 414 by holding that "membership in the labor organization sued" is a prerequisite to bringing a suit under LMRDA, and noting that Tanzillo has not been a member

of Local 617 since his voluntary withdrawal in 1967. There is, however, simply no requirement that a LMRDA private plaintiff be a member of the union sued at the time the suit is commenced; rather, it is only necessary that the plaintiff have rights that are protected by LMRDA. 29 U.S.C. § 412, which creates the private right of action, applies to *"any person"*—not "any union member"—"whose rights secured by the provisions of this subchapter have been infringed ...." (Emphasis added.) *Hughes v. Local No. 11*, 287 F.2d 810 (3d Cir.), *cert. denied*, 368 U.S. 829, 82 S.Ct. 51, 7 L.Ed.2d 32 (1961), on which the majority relies, is not to the contrary. That case involved a plaintiff who had never formally been admitted into union membership, and therefore arguably had never come within the protections of LMRDA. Thus, the majority cannot dodge the central issue of

that so long as a collective bargaining agreement continues to affect the employment-related rights of an individual who at one time worked under its provisions, he or she remains an "employee" within the meaning of § 414 entitled to copies of that agreement. I dissent from the court's contrary holding.

We are not in this case dealing with "secrets of state", or trade secrets, or classified confidential information. All that Mr. Tanzillo was seeking was a copy of the union contracts for the period that he was a member of Local 617. Thus, there is a perverse irony in the majority's construction of progressive legislation that was intended to give union members a "bill of rights." Though Local 617 collected his dues for more than sixteen years, the majority will not even require the union to provide Tanzillo a copy of the contract that they negotiated in his behalf. It is nothing less than shocking that the statute[5] is so patently misconstrued to the detriment of working men and women, when the obligation of providing a copy of the contract to its own former member is such a miniscule burden on the union that purportedly represented him during the period in issue. Working men and women face enough barriers to obtaining the pensions to which they are due, and for which over the years they have labored; this court should not impose unnecessary burdens on retirees who merely seek to ascertain what pension rights their union, as the bargaining representative, had negotiated on their behalf.

whether Tanzillo has rights protected under LMRDA by denying him standing to sue for their enforcement.

**5.** Even if there were no statutory bill of rights, under the union's fiduciary obligation, it should

be obligated to provide a copy of the collective bargaining agreement when requested under the circumstances of this case. *Cf.* footnote 2 *supra.*